FRANK WALTERS and EDWARD WILLIAMS, JR., Appellants, v. CITY OF ST. LOUIS, a Municipal Corporation; JOSEPH M. DARST, Mayor of the City of St. Louis; and DEL L. BANNISTER, Collector of the City of St. Louis, Missouri, and Director of the Collection Division of the Department of Finance of the City of St. Louis, Missouri, Respondents, No. 43648—259 S. W. (2d) 377.

Court en Banc, June 8, 1953.

Rehearing Denied, July 13, 1953.

*Stanley M. Rosenblum* and *A. Clifford Jones* for appellants.

*James E. Crowe, James V. Frank, John P. McCammon* and *Charles J. Dolan* for respondents.

HOLLINGSWORTH, J.—This action involves the constitutionality of Ordinance No. 46,222 of the City of St. Louis, commonly called and herein referred to as the "earnings tax" ordinance. The trial court upheld its constitutionality and plaintiffs appealed.

Appellants, one a resident of the City and the other a resident of St. Louis County, are wage compensated employees of the Shapleigh Hardware Company, a corporation domiciled and doing business in the City. Since the enactment of the ordinance and pursuant to its

provisions, the employer has withheld and unless the ordinance is declared invalid will continue to withhold from their wages as they accrue one-half of one per centum thereof for disbursement to the City in discharge of the tax levied upon their wages under said ordinance. The petition, which names the City, its Mayor, its Collector, and Shapleigh Hardware Company as defendants, prays a judgment declaring the ordinance void, declaring the act of the Legislature which authorized its enactment void, and enjoining the defendants from carrying the ordinance into effect. It appearing [380] to the trial court after submission that no issue was presented as to Shapleigh Hardware Company, it was conditionally dismissed from the action.

The grounds upon which plaintiffs sought judgment declaring the ordinance void and upon which they assign error of the trial court in refusing to so hold are:

(1) The enabling act of the 66th General Assembly upon which the ordinance is predicated, to-wit: House Substitute for House Bill No. 50, now §§92.110-92.200 RSMo 1949 V.A.M.S., is violative of the following provisions of the Constitution of Missouri:

(a) Article III, § 40, prohibiting the enactment of local or special laws in the instances set forth in clauses (21) and (30) thereof;

(b) Article X, § 11(f), authorizing enactment of general laws permitting a county or other political subdivision to levy taxes other than those ad valorem; and

(c) Said House Bill No. 50 was not enacted in compliance with Article III, § 22, requiring each committee of the House and Senate to which a bill is referred to keep a record of its proceedings and report the vote of its members to be filed with all reports thereon.

(2) The ordinance and said House Bill No. 50 are arbitrary, unreasonable, discriminatory, vague and therefore violative of the due process clause of the Constitution of Missouri, to wit: Article I, § 10; of the due process and equal protection clauses of the Constitution of the United States, to wit: the Fourteenth Amendment thereof; and of Article X, § 3, of the Constitution of Missouri, requiring that taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax and shall be levied and collected by general laws.

On the 19th day of May, 1950, the Board of Aldermen of the City of St. Louis adopted a resolution stating in part:

"We * * * do hereby take official recognition of the impending financial crisis confronting the City of St. Louis.

"Whereas, the cost of government in the City of St. Louis has increased from approximately $20,000,000 to $40,000,000 in the last ten years, and the ordinary sources of taxation have not been sufficient to meet this increase in the cost of municipal government, and it has heretofore been necessary to enact an earnings

tax in the City of St. Louis for the maintenance of the solvency of our local government; and

"Whereas, the General Assembly of the State of Missouri has heretofore enacted enabling legislation authorizing the City of St. Louis to levy an earnings tax which has been productive of approximately $7,000,000 per year, and the authority heretofore granted by the said General Assembly expires on July 17, 1950, and that thereafter the City of St. Louis will not have authority to continue this vital source of income; and

"Whereas, the loss of the aforesaid income would necessarily result in a curtailment of City services, thus endangering the health, welfare and safety of our citizens.

"Now, Therefore Be It Resolved, that we * * * do hereby urge the Honorable Forrest Smith, Governor of the State of Missouri, to call a special session of the General Assembly for the purpose of continuing the authorization of this City to levy an earnings tax, and we further request the members of the General Assembly of the State of Missouri to act favorably upon said proposed legislation; * * *."

The City of St. Louis is a constitutional charter city, having a population of more than 700,000 inhabitants as determined by the decennial census of 1950. Organized under Article IX, §§20-26, Constitution of 1875, in the dual character of both a city and county, it has the unique distinction of being the only city specifically named in the Constitution of 1945, Article VI, § 31. It is also agreed that, although possible, it is a practical certainty no other such constitutional charter city of more than 700,000 inhabitants will come into existence in Missouri during the period of time in which House Bill No. 50 is effective.

(Although not specifically named in the Constitution of 1945, Kansas City was and still is a constitutional charter city, and, subsequent to the adoption of the 1945 Constitution, University City, Columbia, Springfield, and possibly others, have framed and adopted their own charters. Section 82.010 RSMo 1949 V.A.M.S. recognizes their status in that respect along with that of the City of St. Louis.)

In its dual capacity as a city and county, the expenditures of the City of St. Louis for the fiscal year 1943-1944 amounted to $21,752,165, and its expenditures in said dual capacity in the fiscal year 1951-1952 amounted to $43,052,595. Established sources of revenue, absent an earnings tax, or an increase of other taxes, or a levy of additional taxes, are insufficient to meet the requirements of appropriations as passed by the Board of Aldermen. In the fiscal year 1951-1952 the operating deficit amounted to $3,307,138. The enabling act approved by the Governor on the 28th day of May, 1948, authorizing the City to levy a tax on earnings for the period ending July 17, 1950, and the tax levied pursuant to said act of 1948, yielded a tax during the two-

year period of the existence of said ordinance amounting to $12,906,-085, and during the two years said tax was in effect the City was able to operate without a deficit.

The enabling act here involved, hereinafter referred to as House Bill No. 50, became effective (unless held to be unconstitutional) on July 29, 1952. Insofar as pertinent, it provides:

§ 92.110. "Any constitutional charter city in this state which now has or may hereafter acquire a population in excess of seven hundred thousand inhabitants, according to the last federal decennial census, is hereby authorized to levy and collect, by ordinance for general revenue purposes, an earnings tax on the salaries, wages, commissions and other compensation earned by its residents; on the salaries, wages, commissions and other compensation earned by nonresidents of the city for work done or services performed or rendered in the city; on the net profits of associations, businesses or other activities conducted by residents; on the net profits of associations, businesses or other activities conducted in the city by non-residents; and on the net profits earned by all corporations as the result of work done or services performed or rendered and business or other activities conducted in the city."

§ 92.120. Such tax shall not be in excess of one per centum per annum.

§ 92.150. "The net profits or earnings of associations, businesses or other activities, and corporations shall be ascertained and determined by deducting the necessary expenses of operation from the gross profits or earnings."

§ 92.200. The act shall expire April 1, 1954.

■ Appellants thus state their first contention:

"The gravamen of appellants' charge that House Bill No. 50 is unconstitutional is found in those provisions of our Constitution of 1945 prohibiting special legislation, namely, Article III, Section 40, subparagraphs 21 and 30, and Article X, Section 11(f). Simply stated, appellants submit that the classification of constitutional charter cities by population according to the last federal decennial census when read with the final section of the act causing it to expire April 1, 1954, six years before the next federal decennial census, makes the act applicable only to the City of St. Louis under a then existing state of facts and by its very terms fails to hold the class open so that other constitutional charter cities might come within it. This requirement that a statute be "open-ended" in order to avoid the constitutional prohibition against special legislation is well-settled in Missouri; and this fundamental requisite of a general law—its "open endedness"—is as applicable to the City of St. Louis as to any other political subdivision in this state."

Respondents' answer to this contention is that Article VI, § 31, of the Constitution of 1945, classifying the City of St. Louis in its dual

capacity of city and county and affirming its powers, organization, rights and privileges, being special in its terms, prevails over the general provisions of Article III, § 40, prohibiting the General Assembly from passing any local or special law (clause 21) regulating the affairs of counties and cities, or (clause 30) where a general law can be made applicable.

Respondents' contention fails, however, to take into consideration the provisions of Article X, § 11(f), of the Constitution, which is as follows: ''Nothing in this constitution shall prevent the enactment of any *general law* permitting any county or other political subdivision to levy taxes other than ad valorem taxes for its essential purposes.'' (Emphasis ours.) By the clear implication of that provision, legislative permission to any city or other political subdivision to enact an earnings tax ordinance can only be granted by a general law. We can attach no other meaning to it. Of course, this does not mean that a general law permitting the levy of such a tax would be local or special because it was operative only in the City of St. Louis, provided it was prospective in its terms so as to become operative in other cities as they come within the classification therein specified. State ex rel. Zoological Board of Control v. City of St. Louis, 318 Mo. 910, 1 S.W. 2d 1021, 1027; State ex rel. Carpenter v. City of St. Louis, 318 Mo. 870, 2 S.W. 2d 713, 718.

Appellants concede the law to be as above stated. They assert, however, that even though House Bill No. 50 purports in the first section thereof (92.110) to be applicable to ''any constitutional charter city in this state which now has or may hereafter acquire a population in excess of seven hundred thousand inhabitants, according to the last federal decennial census * * *'', yet § 92.200 fixing the expiration date of the act at April 1, 1954, is destructive of the recital in the first section and makes the act applicable only to the City of St. Louis under the existing state of facts, and thereby prevents any other constitutional charter city which hereafter may attain a population of 700,000 from the benefit of its provisions.

In support of their position they rely upon the case of Reals v. Courson, 349 Mo. 1193, 164 S.W. 2d 306. One of the grounds upon which the statute there under consideration was declared unconstitutional unquestionably supports appellants' position in the instant case. However, a re-examination of the Reals case has convinced us that although we were correct in holding the statute there involved unconstitutional upon another ground therein discussed, we erred in holding it unconstitutional upon the ground above asserted. (It perhaps should be here stated that the ground upon which we base this conclusion was not advanced in the submission of that case.)

That case involved a statute enacted in 1941. It authorized the boards of directors of school districts, formed of cities and towns in counties having more than 200,000 inhabitants and less than 450,000

inhabitants, * * * to. issue school bonds. The last section thereof provided that the act should. expire January 1, 1946. St. Louis County then was the only county in the State within the range of that classification; and it was, as in the instant case, a practical certainty that no other county would come within that classification during the period in which the statute was to be effective. One of the grounds upon which we held the statute unconstitutional was that the classification therein made was unreasonable and arbitrary in that there were other counties containing school districts similarly situated to which a general law could have been made applicable. As stated, we are convinced the case was soundly ruled on that ground.

But we further said, l.c. 309: "Therefore, we have a legislative enactment classifying counties and thereby school districts so that the act can only apply to the counties—in this instance the county, which on the day of its enactment had the requisite population of more than 200,000 and less than 450,000 inhabitants. It can apply to an existing state of facts only, that is to the one county in Missouri then falling within the classification and therefore, in fact, cannot be said to have created a future class into which other counties might fall." (Cases cited.)

The trouble with the conclusion above quoted is that it denies the well established rule of "open-endedness" to legislation pertaining to cities (or counties or other subdivisions) of a specified classification when it appears with reasonable certainty that no other city (or political subdivision) will come within the classification [383] during the term of the legislation when the term thereof is of limited duration. To so rule would deny to the General Assembly the right to authorize for a limited period of time the City of St. Louis to enact an emergency earnings tax ordinance likewise so limited solely because its population was so far in excess of that of any other city that none would come within the classification during the emergency. We think the Constitution does not sanction such discrimination. The fact that a statute is limited as to the time of its duration does not make it local or special so long as it applies to all within, or that may come within, the enumerated class during its effective period. State ex rel. Attorney General v. Lee, 193 Ark. 270, 99 S.W. 2d 835; 50 Am. Jur., Statutes, §§ 514, 515, p. 525. The act here under consideration does precisely that.

All of the cases cited in support of the conclusion reached in the Reals case deal with legislative acts that are to continue in perpetuity unless repealed. They are soundly ruled. It is obvious that limitation of the operation of an act that is to continue in perpetuity to a certain city or cities then comprising a specified classification without leaving it open to operate upon all cities thereafter attaining the same classification, thereby resulting in the possibility of the act becoming applicable to some one or more, but not all, of the same classification,

would be to deprive the latter of its benefits. Such an act would run afoul of the rule we long since adopted in this State: "A statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special." Reals v. Courson, 349 Mo. 1193, 164 S.W. 2d 306, 307, 308, and cases cited therein.

In the instant case, we are dealing with an entirely different type of legislation: legislation of limited duration. By its terms, the enabling act here involved is operative upon any constitutional charter city in this State that now has or may hereafter acquire a population of more than 700,000 prior to its expiration date of April 1, 1954. The conceded fact that it is a practical certainty no other city in this State will attain a population of more than 700,000 prior to the expiration date of the act, April 1, 1954, does not in the least affect the situation. The act still does not exclude any city that *may* come within the classification therein made during its effective existence; to the contrary, it expressly includes any such city. It therefore applies to all cities of more than 700,000 population, whether there be one or many, so long as it is effective, and does not offend against the rule. Consequently, the Reals case should no longer be followed insofar as it is in conflict herewith. Appellants' contention of unconstitutionality of House Bill No. 50 in the foregoing respects must be overruled.

The next assignment deals with the last sentence of Article III, § 22, of the Constitution, reading: "Each committee [to which a bill has been referred] shall keep such record of its proceedings as is required by rule of the respective houses and this record and the recorded vote of the members of the committee shall be filed with all reports on bills."

Following the adoption of the Constitution, the Senate adopted a rule implementing the above provision, and which in the 66th General Assembly was designated as Rule 44, reading as follows: "Each committee shall keep a record of the total number of members present when a bill is finally considered; and this record and the record of the total number voting favorably and the total number voting unfavorably on said bill, shall be filed by the committee with its report (Constitution, Art. III, Sec. 22)." It is stipulated that the report of the Ways and Means Committee of the Senate to which House Bill No. 50 was referred was made in the same manner as the reports of the several committees of the several sessions of the 63rd, 64th, 65th and 66th General Assemblies on all bills passed at each session thereof, and that such is the procedure now followed.

The report on House Bill No. 50 showed the vote thereon as follows: "Members present: 10; Members voting aye: 9; Members voting no: 0; Members not voting: 1."

Appellants insist that the report as made is insufficient in that it does not set forth the names of the individual members and how

each of them voted. In support of that contention they cite many cases in an effort to establish that the provisions of said Sec. 22 are mandatory and quote extended excerpts from the debates on this section during the Constitutional Convention in an effort to establish that the construction they place upon the meaning of § 22 is its intendment. Respondents cite cases and quote excerpts from the debates in an effort to establish the contrary of both contentions made by appellants. No good purpose would be served in a discussion of these cases or debates. This, for the reason that the provision simply does not require the recording of the vote of each of the members. This court would be going far afield in interpolating into the provision language that is not there and then declaring it mandatory. No one can say that the construction placed thereon by the Senate is not a literal compliance with its provisions. This point must be ruled against appellants.

■ This brings us to appellants' contention that the ordinance and House Bill No. 50 are unreasonable, discriminatory and uncertain and therefore violative of (a) the due process clause of the Constitution of Missouri, (b) the due process and equal protection of the laws clauses of the Federal Constitution, and (c) the requirement of uniformity of taxes levied upon the same class of subjects within the territorial limits of the levying authority.

Section Two of the ordinance imposes the tax of one-half of one per centum on (a) the salaries, wages, commissions and other earned compensation of individuals and on (b) the net profits of corporations, associations and businesses. "Net profits" are defined in Section One thereof as "the net income of any association, business or corporation remaining after deducting the necessary expenses of operation from the gross profits or earnings." Section Nine thereof charges the city collector with the enforcement of the ordinance and empowers him to adopt, promulgate and enforce "rules and regulations relating to any matter or thing pertaining to the administration and enforcement of the provisions of the ordinance * * *." Pursuant thereto, he promulgated and published in pamphlet form, under date of August 28, 1952, a set of rules and regulations. In the foreword attached thereto, it is stated: "This first issue of the rules and regulations, which is flexible, is *intended as a guide* to those subject to the Earnings Tax and will be supplemented from time to time as may be necessary." (Emphasis ours.)

Among the rules so adopted was a definition of the meaning of the term "net profits". It declared, as does House Bill No. 50, "net profits" to be the net income of any association, business or corporation remaining after deducting the necessary expenses of operation from the gross profits or earnings. It then authorized the following deductions from gross profits or earnings in determining "net profits": (1) ordinary and necessary expenses of conducting the business; (2) all losses, including reasonable allowances for exhaustion, depreciation,

obsolescence or wear and tear; (3) bad debts arising and charged off during taxable year; (4) all taxes except those for local benefits and on inheritances; (5) all interest paid within the year on taxpayer's indebtedness; and (6) charitable contributions not in excess of 5% of net income.

In launching their attack upon this phase of the ordinance, appellants assume that the rules promulgated by the collector are to be treated as a part and parcel of the ordinance. If they are to be so treated, the result is that the ordinance will become void whenever the city collector, through ignorance, excessive zeal or sheer venality, promulgates a rule that is discriminatory, vague or uncertain. While it is true that he is authorized to make rules relating to "any matter or thing pertaining to the administration and enforcement" of its provisions, certainly he is not thereby impliedly empowered to make any rule that will invalidate the ordinance.

Furthermore, this action does not seek to have the ordinance declared unconstitutional because of any administrative or enforcemental rule adopted. A careful reading of the petition fails to disclose any mention of the rules other than that the ordinance "attempts to empower the defendant collector * * * to promulgate necessary rules and regulations for the administration of the tax, and authorizing every employer collecting or remitting the tax to deduct and retain therefrom three per cent of the total amount withheld * * *." No where in the charging part or in the prayer of the petition is any complaint leveled against or relief sought on account of the rules. But appellants say the case was tried upon that theory and cite as authority for their assertion the agreed statement of facts, wherein a recital is made as to the adoption of the ordinance and promulgation of rules, and that a "copy of said ordinance and said pamphlet is hereto attached, * * * incorporated herein by reference, pursuant to which ordinance and enabling act defendant Del L. Bannister [Collector] claims the funds withheld from the wages of plaintiffs by defendant Shapleigh Hardware Co."

We are clearly of the opinion that such a recital in the agreed statement of facts cannot inject into the case an issue that is wholly foreign to the whole theory upon which the action is predicated and pleaded.

However, we are convinced that a mere misconception, if such it be, on the part of the collector at the time he issued the first set of rules defining his idea of what constituted allowable deductions in reckoning "net profits", or a vague statement therein, whereby some advantage might accrue to a business institution or self-employed individual as against a wage earner, could not invalidate the ordinance. The rules, at most, purport to be no more than a guide. See City of Louisville v. Sebree, 308 Ky. 420, 214 S.W. 2d 248, 255; Sutherland's Statutory Construction, 3rd Ed., Vol. 2, § 2405, p. 180. For instance, it would be wholly unreasonable to declare unconstitutional a state statute be-

68

cause an administrative agency promulgated a discriminatory rule in attempting to enforce it. Likewise, so would it be to declare an ordinance void on the same basis.

 Is the classification of those subject to the provisions of the act into two groups, to wit: (1) those in business for themselves and (2) wage earners, arbitrary and unreasonable?

Appellants concede, as they must, that a state may make such classifications even though they result in the imposition of unequal taxes on the various classes, provided the classifications are reasonably related to the ends the statute seeks to achieve, citing Caskey Baking Co. v. Commonwealth of Virginia, 313 U. S. 117, 61 S. Ct. 881, 85 L.Ed. 1223; Nashville, C. & St. L. Ry. v. Browning, 310 U. S. 362, 60 S.Ct. 968, 84 L. Ed. 1254; Madden v. Commonwealth of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590. They contend, however, the classification here made is unreasonable and arbitrary and, in so doing, rely strongly upon the cases of Quaker City Cab Co. v. Commonwealth of Pennsylvania, 277 U.S. 389, 48 S.Ct. 553, 72 L.Ed. 927, and City of St. Louis v. Spiegel, 75 Mo. 145.

In the Quaker City Cab case, the statute involved levied a tax upon the gross receipts of "every transportation company, now or hereafter incorporated or organized" under the laws of any sovereignty and doing business in Pennsylvania, owning or operating any railroad or other device for the transportation of freight or passengers. The Quaker Company, a New Jersey corporation, operated a fleet of taxicabs in Pennsylvania. In so doing, it was subjected to competition by individuals and partnerships operating taxicabs. The court held the act violative of the Fourteenth Amendment, saying: "In effect section 23 divides those operating taxicabs into two classes. The gross receipts of incorporated operators are taxed, while those of natural persons and partnerships carrying on the same business are not. The character of the owner is the sole fact on which the distinction and discrimination are made to depend. The tax is imposed merely because the owner is a corporation. The discrimination is not justified by any difference in the source of the receipts or in the situation or character of the property employed." The syllabus in the Spiegel case fairly summarizes the nature of the case and its holding: "A license fee upon the keepers of meat-shops is a tax, and must be uniform within the territorial limits of the authority imposing it. Const. 1875, art. 10, § 3. A city ordinance, therefore, which requires a license fee of $100 in one part of the city and $25 in the rest, is void."

It is clear there is no analogy between the classifications in those cases and the instant case. In those cases there was patent discrimination between taxpayers of the same class, to wit: those engaged in identical occupations. Other cases cited by appellants, far too numerous to separately discuss, are found not to be in point.

In determining the reasonableness of the classification made by the ordinance here involved, certain established rules of construction are pertinent:

"Classification is not discrimination. It is enough that those in the same class are treated with equality." Caskey Baking Co. v. Commonwealth of Virginia, 313 U. S. 117, 61 S. Ct. 881, 883, 85 L.Ed. 1223. See also: State ex rel. Jones v. Nolte, 350 Mo. 271, 282, 165 S.W. 2d 632, 636; Campbell Baking Co. v. City of Harrisonville, 50 F. 2d 670, 673; City of St. Charles ex rel. Palmer v. Schulte, 305 Mo. 124, 129, 130, 264 S.W. 654, 655, 656.

In Madden v. Commonwealth of Kentucky, 309 U. S. 83, 60 S. Ct. 406, 84 L.Ed. 590, the court said: "The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. This Court fifty years ago concluded that 'the fourteenth amendment was not intended to compel the states to adopt an iron rule of equal taxation,' and the passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." See also Hull v. Baumann, 345 Mo. 159, 131 S. W. 2d 721, 726.

In the case of Dole v. City of Philadelphia (1940), 337 Pa. 375, 11 A. 2d 163, the Supreme Court of Pennsylvania had under consideration an ordinance similar to the ordinance here involved. That ordinance imposed a tax on (a) salaries, wages, commissions and other earned compensations, and (b) on the net profits of businesses, professions or other activities. In discussing that feature of the ordinance, the court said: "Furthermore, salaries and wages are in their nature essentially certain, and free from the speculative features inevitably attached to net profits. A business or professional man at the end of a year of industrious work may find that his efforts have produced no net income,— only a loss. In another year his net profit may be tremendous. The salaried man or wage earner proceeds on a more even keel. He usually knows in advance of performance just how much his salary or wage will be. Also, he knows currently what he is earning, while the business or professional man generally calculates his net profit or loss on an annual basis. He has to operate and calculate on a

long range basis. Many of our laws for the benefit of employees are based upon these, and other fundamental and universally recognized, differences between the earning position of an employee and that of a business or professional man depending, not on salary, but on net profits for his livelihood.''

A more recent case upholding a similar classification is the case of City of Louisville v. Sebree (1948), 308 Ky. 420, 214 S.W. 2d 248.

It is clear that the ordinance in the instant case deals with two distinct subjects of taxation and with two broad and distinct classes of taxpayers. One deals with "salaries, wages, commissions and [387] other compensation", for which the individual earner is liable. The other deals with "net profits" of those in business for themselves, for which they are liable. Within each class there is no discrimination. No sound reason has been advanced to show such classification unreasonable. We hold the ordinance valid in this respect.

Finally, appellants say that the term "not profits", as defined in the ordinance, is so uncertain that the legislative intent can only be gathered from the collector's regulations. We cannot agree. Section One of the ordinance defines "net profits" as "the net income of any association, business or corporation remaining after deducting the necessary expenses of operation from the gross profits or earnings.'' It is substantially in the wording, and has the identical meaning, of the definition of "net profits" set forth in House Bill No. 50. The meaning is clear and definite. The problem of what constitutes "necessary expenses of operation" is, and perhaps always will be, vexing. It is a matter of common knowledge that the concept of the meaning of this phrase changes from time to time as accepted methods of accounting change. In any event, however, for the reasons hereinabove stated, the question of whether the rules promulgated by the collector in an effort to provide a uniform method of determining "net profits" are discriminatory is not before us. Appellants' final point is therefore overruled.

The judgment of the trial court is affirmed. All concur.