R. Jon BOPP et al., Plaintiff-Appellant,

v.

James I. SPAINHOWER et al., Defend-
ants-Respondents.

No. 58750.

Supreme Court of Missouri,
En Banc.

Feb. 10, 1975.

Richard F. Provaznik, Richmond Heights, for plaintiff-appellant R. J. Bopp.

John C. Danforth, Atty. Gen., Mark D. Mittleman, Asst. Atty. Gen., Robert H. House, Asst. Atty. Gen., Jefferson City, for defendants-respondents.

HOLMAN, Judge.

Plaintiffs, R. Jon Bopp and Patrick E. Payne, residents of St. Louis County, filed this taxpayer suit seeking a declaration that H.S. for H.B. 65 (now Sections

94.600 to 94.655 inclusive, V.A.M.S.) is unconstitutional and invalid. The Act in question authorizes the imposition of a local sales tax for transportation purposes. The defendants are the state treasurer and the director of revenue. The trial court found in favor of defendants. Plaintiff Bopp (hereinafter referred to as plaintiff or appellant) has appealed. The parties have filed an "Agreed Statement of the Case." We have jurisdiction because the appeal involves a construction of constitutional provisions as well as construction of a revenue law of this state. Art. V, Sec. 3, Mo.Const., V.A.M.S. We affirm.

The Act in question became effective on June 13, 1973. It authorized certain cities and counties to impose a sales tax not exceeding one-half of one percent on such sales and services as are subject to the state sales tax. The section we are particularly concerned with is 94.605(1) which provides that "Any city not within a county, any first class county operating under a charter form of government and not containing a city or part of a city of over four hundred thousand inhabitants, and any city of over four hundred thousand inhabitants wholly or partially within a first class county, may by a majority vote of its governing body impose a sales tax for transportation purposes enumerated herein." It is conceded that St. Louis County, St. Louis City and Kansas City were the only political subdivisions that were qualified to levy the tax under said subsection at the time this suit was filed and that each has done so.

Under other provisions of the law any other city with a population of 500 or more could levy a tax by majority vote of its governing body with the further provision that such be approved by a majority of the voters voting on the proposal at a regular or special election. An exception provided for that authorization is that in the classification to which St. Louis county ·belongs cities were prohibited from adopting the tax before January 1, 1974, and not at all in the event the county imposed the tax.

At the time this suit was filed no city had levied a tax under the authorization specified in this paragraph.

In their petition plaintiffs alleged that the Act under consideration was unconstitutional because "1. Plaintiffs were denied equal rights under the law, guaranteed to them under the provisions of Article I Section 2 of the Constitution of Missouri 1945 in that said bill denied to plaintiffs the opportunity to vote upon a proposal to impose said sales tax for transportation purposes in St. Louis County. 2. Said bill denied to plaintiffs due process of law guaranteed to them under the provisions of Article I Section 10 of the Constitution of Missouri 1945 in that H.S.H.B. No. 65 was arbitrary, discriminatory and unreasonable in its attempt to classify the county and the cities in which said sales tax might be imposed by majority vote of the legislative body. 3. Said bill was a special and local law in violation of Article III Section 40 Clauses (21) and (30) of the Constitution of Missouri 1945 in that it authorized the legislative body of the County of St. Louis to impose said tax by a majority vote without submitting it to approval of the voters."

Plaintiff Bopp resided in the city of Ballwin and plaintiff Payne resided in Ellisville, both of which have populations exceeding 500 inhabitants.

The Agreed Statement further provides that "At the time the lawsuit was commenced, St. Louis County was the only first class county in Missouri operating under a charter form of government and not containing a city or a part of a city of over 400,000 inhabitants. The population of St. Louis County according to the 1970 Federal Decennial Census was 951,353 inhabitants.

"At the time the lawsuit was commenced, Jackson County was the only other first class county operating under a charter form of government, but did contain a city or part of a city of over 400,000 inhabitants.

"At the time of the commencement of the lawsuit, the City of St. Louis was the only city in the State of Missouri that was not within a county.

"At the time the lawsuit was commenced, Kansas City was the only city of over 400,000 inhabitants in the State of Missouri that was wholly or partially within a first class county, to-wit: Jackson County.

"At the time this lawsuit was commenced, St. Louis County and Jackson County were the only first class counties in the State of Missouri.

"In 1970 the counties in Missouri which had an assessed valuation in excess of $300,000,000 were St. Louis County, Jackson County and Clay County.

"In 1971 the counties in Missouri which had an assessed valuation of $300,000,000 or more were St. Louis County, Jackson County, Clay County and Greene County."

It should also be noted that Section 48.-020 [1] provides that "All counties now having or which may hereafter have an assessed valuation of three hundred million dollars and over shall be in the first class." Section 48.030 states that ". . . a county of the second class may become a county of the first class if the assessed valuation of the county is such to place it in the first class for three successive years. The change from one classification to another shall become effective at the beginning of the county fiscal year following the next general election after the certification by the state equalizing agency for the required number of successive years that the county possesses an assessed valuation placing it in another class. If a general election is held between the date of the certification and the end of the current fiscal year, the change of classification shall not become effective until the beginning of the county fiscal year following the next succeeding general election."

A sales tax of one-half of one percent was imposed by St. Louis County Ordinance No. 6792 effective July 1, 1973, and plaintiffs have been required to pay said tax since said date upon all purchases of taxable goods and services in said county.

The trial court made detailed findings of fact and conclusions of law which covered nine pages in the Agreed Statement. We deem it unnecessary to incorporate those findings herein as it is sufficient to say that all such findings were contrary to the contentions of the plaintiffs.

■ Plaintiff's first point on this appeal is that "The court erred in finding that H.S.H.B. No. 65, 77th General Assembly (1973), specifically the provisions now codified as Sections 94.605.1 and 94.605.3 did not violate the provisions of the Constitution of Missouri, 1945, Article III, Section 40, prohibiting the General Assembly from passing any local or special law, Clause (21) regulating the affairs of counties and cities, or Clause (30) where a general law can be made applicable, because the provisions of such subsections did not create a future class into which other counties or cities might fall." We have heretofore set out subsection 1. Subsection 3 reads as follows: "Provided, that no incorporated municipality located wholly or partially within any first class county operating under a charter form of government and not containing a city or part of a city of over four hundred thousand inhabitants shall impose such a sales tax prior to January 1, 1974; and provided, further, that in the event such a first class county imposes such a sales tax, no incorporated municipality located wholly or partially within such county shall levy such a sales tax." Plaintiff advances a number of reasons for this contention. The first is that these subsections are phrased in the present tense so that they apply to St. Louis County alone and no other county could qualify thereunder in the future. We do not agree. We see nothing in the wording of

I. All statutory citations are to V.A.M.S.

those subsections to preclude a county from later qualifying thereunder. The cases relied upon (State ex inf. Mueller v. Fry, 300 Mo. 541, 254 S.W. 1084 (1923) and State ex inf. Barker v. Southern, 265 Mo. 275, 177 S.W. 640 (1915) ) would appear to be distinguishable on the facts and, in any event, are not in accord with the more recent cases on the subject.

The next reason advanced in support of this contention is that subsection 3 requires that a county of the class specified impose the tax before January 1, 1974, and that it was not possible for any county, other than St. Louis County, to attain that class by that date. The provision in question does not say that the county must impose the tax before January 1, 1974, although a reasonable argument could be made for that construction. We do not find it necessary, however, to construe the provision in that respect. This for the reason that even if we assume that the county had to qualify before January 1, 1974, it would have been *possible* for Jackson County to have so qualified. It is agreed that Jackson County was a first class county operating under a charter. The only other requirement was that it not contain a city of over 400,000 inhabitants. According to the 1970 census Kansas City had a population of 507,330. In the six and one-half months that elapsed between the effective date of this Act and January 1, 1974, it was possible, although concededly not likely, that said population could have been reduced to less than 400,000. This could have occurred by reason of war or an extensive fire or an epidemic of serious proportions or other unforeseen disaster.

In State ex rel. Fire Dist. of Lemay v. Smith, 353 Mo. 807, 184 S.W.2d 593, 595 (1945) this court ruled as follows: "St. Louis County is the only county now within the population bracket stated in the act. Such fact alone does not make the act a special law for the reason the act will also apply to other counties which will attain the same population in the future. Where

an act is potentially applicable to other counties which may come into the same class it is not a local law." More specifically in point is Walters v. City of St. Louis, 364 Mo. 56, 259 S.W.2d 377, 383 (1953), wherein this court said that: "In the instant case, we are dealing with an entirely different type of legislation: legislation of limited duration. By its terms, the enabling act here involved is operative upon any constitutional charter city in this State that now has or may hereafter acquire a population of more than 700,000 prior to its expiration date of April 1, 1954. The conceded fact that it is a practical certainty no other city in this State will attain a population of more than 700,000 prior to the expiration date of the act, April 1, 1954, does not in the least affect the situation. The act still does not exclude any city that *may* come within the classification therein made during its effective existence; . . . It therefore applies to all cities of more than 700,000 population, whether there be one or many, so long as it is effective, and does not offend against the rule." See also Collector of Revenue v. Parcels of Land, Mo., 517 S.W.2d 49.

The final reason advanced in support of the contention that this is a special local law is that no other county could come within the county classification before the date of the expiration of the Act without a change in the law. Our finding that it is possible for Jackson County to attain that class by the date indicated makes it unnecessary to decide this contention but we will, nevertheless, deal with it briefly. Plaintiff relies on State v. Logan, 268 Mo. 169, 186 S.W. 979 (1916); State ex inf. Mueller v. Fry, 300 Mo. 541, 254 S.W. 1084 (1923) and State ex inf. Gentry, Atty. Gen. v. Armstrong, 315 Mo. 298, 286 S.W. 705 (1926). It is true that each of these cases mentions the fact that no other political subdivision could come within the classification without a change in the Constitution or law. It appears, however, that the decision invalidating the law in each case is primarily based on the fact that the basis

for classification did not bear any reasonable relationship to the·object to be accomplished. Also, later decisions do not appear to attach significance to the fact that a change in the law may be required in order to admit others. See Collector of Rev·enue v. Parcels of Land, supra, and Davis v. Jasper County, 318 Mo. 248, 300 S.W. 493 (1927).

■ Both Greene and Clay Counties became first class counties on January 1, 1975. If they should so desire either or both could adopt a charter under the provisions of Art. VI, Sec. 18, Mo.Const. before the Act expires on December 31, 1975. In that event Greene County would come under the classification in question and Clay County could do so in the unexpected event that the population of Kansas City should be reduced to less than 400,000. Plaintiff takes the view that the adoption of a charter is a change in the law and hence such a possibility would not preclude this provision of the law from being special and therefore unconstitutional. Even if we assume that the requirement of a change in law would have that effect, we do not think the adoption of a charter is the type of change in the law to which the rule would apply. While charter provisions have the effect of laws of limited application we have the view that the rule in question (if it actually exists) contemplates a change in the Constitution or statutes of this state.

■ In his next point plaintiff reiterates his contention relating to the St. Louis County classification which we have heretofore ruled. He also makes a similar contention in regard to the classification into which St. Louis City falls. Since plaintiff resides in St. Louis County we rule that he does not have standing to attack the St. Louis City classification. We observe, however, that the Collector of Revenue case, supra, would seem to require a ruling adverse to plaintiff's contention.

■ The third point relied on (which is very similar to the fourth point) is not properly presented for review since it is not developed in any manner in the argument portion of the brief. Rule 83.05(a), V.A.M.R., Kansas City v. Howe, 416 S.W. 2d 683[16] (MoApp.1967); Aiple v. South Side National Bank in St. Louis, 442 S.W. 2d 145[2] (Mo.App.1969). We accordingly will not specifically rule that point although as stated, it is similar to the next point which is discussed in detail.

The fourth point briefed is that the court erred in ruling that there was no evidence to indicate that the General Assembly acted arbitrarily and unreasonably in providing that a sales tax could be imposed in the class embracing St. Louis County " . . . by majority vote of the governing body of such county while such sales tax could only be imposed in other cities of over 500 population by vote of the people upon referral of the ordinance passed because the court misapplied the applicable law in that the evidence must show distinctive differences in order to justify the classification."

In connection with this contention we note that no evidence was offered and no facts agreed upon which would disclose the conditions which brought about the passage of this law. Most of those facts, however, are so widely known that we can take judicial notice thereof. About 15 or 20 years ago conditions developed in our large metropolitan areas which, in most instances, made it impossible to operate mass transit systems without incurring a loss. The situation has become increasingly more serious, financially, as the years have passed and now most all such systems must be subsidized by public funds. In addition to rapidly increasing operating costs other reasons for this condition appear in the following: "Urban transportation increasingly has become the most important segment of the Nation's transportation system because of the concentration of population in urban areas. For over half a century, population has migrated from rural portions of the county to the cities, and then from the central cities to the suburbs. As

a result, 74 percent of the Nation's population resided in the cities and their surrounding suburbs in 1970. This trend is forecast to continue so that, by 1990, 82 percent of the population will be living in urban areas. In less than a century, the Nation will have been transformed from a predominantly rural country with pockets of urbanization to one that is almost completely urbanized, with large areas of sparse rural development.

"Rapid urbanization is a cause of many problems that the Nation now faces—not the least of which has been termed the 'urban transportation problem.'" 1972 National Transportation Report, U.S. Dept. of Transportation. "In the space program, we have proven that we can move three men one million miles. But downtown, in any one of our large cities, the real difficulty lies in moving one million people just three miles. Private automobile travel offers many features and advantages presently unobtainable in any other form of transportation. The automobile frees the driver from reliance on fixed schedules and from waiting for buses or trains. It spares the driver from lugging packages in crowded, uncomfortable public conveyances and from annoying transfers from one form of travel to another. Its advantages during inclement weather are pronounced. It takes its operator door-to-door or door-to-lot by the most direct route. It makes suburban living, particularly the shopping and commuting aspects, possible." Cooper, "Prospects for a Mass Movement to Public Transit (1972)", 5 Urban Lawyer 679.

As the use of the automobile for transportation in urban areas increased the number of passengers using public transportation decreased thus causing diminished revenue. An effort to increase revenues by increasing fares caused a further decrease in passenger use and revenues. See State Subsidies for Public Transit, 4 Urban Lawyer 59, 63. A situation therefore developed whereby public transportation operations in our metropolitan areas could no longer continue without the aid of public subsidies. While the number of passengers decreased there remained a large number of persons who were completely dependent on public transportation so that it was essential that that form of transportation continue to be available.

The General Assembly, in recognition of the situation, appropriated $550,000 in 1972 for engineering and planning of the rapid transit systems being developed in St. Louis and Kansas City. The situation was so desperate that the same bill appropriated $1,265,000 for aid to Bi-State Development Agency. Laws of Missouri 1971–72 pp. 503, 504. Bi-State is a public service corporation which operates the public transportation systems in St. Louis City and County as well as other areas. Again in 1973 the legislature appropriated $215,456 to Bi-State to cover operating deficits. Since that time, probably because of the sales tax here in question, no further appropriations have been made. Recently, the federal government has appropriated a rather large sum to most all cities for aid in solving their public transportation problems.

■ We rule that a reasonable basis existed for enacting a different procedure for the three large metropolitan areas of the state than was provided for other cities. While smaller cities probably had some public transportation problems they were obviously not as acute as those confronting the large cities as evidenced by the fact that none of those cities have found it necessary to impose the tax. The situation was quite different in the three metropolitan areas. They required immediate relief. The ordinance for St. Louis County was enacted and was in operation 17 days after the Act in question became effective. The legislature undoubtedly concluded that because of the existing emergency in those areas it was not prudent to risk the delay and uncertainty that would have resulted from a referendum such as was provided for the smaller cities.

Its action in that regard was not arbitrary or unreasonable.

Plaintiff's next contention is that the trial court erred in holding that the concentration of population and transportation requirements of the class which included St. Louis County made it reasonable to permit such counties to impose the transportation tax when there were other counties to which the law should have been made applicable which had inadequate funds for transportation purposes. A short answer to this contention is that there is no evidence in the record to support it. Moreover, we take judicial notice of the fact that no other county in the state can be compared to St. Louis County either as to population or transportation problems. The only other county in any way comparable is Jackson County and it presents a much different situation. While Jackson County has a population of 654,000 (as compared to 951,000 in St. Louis County) most of those people live in Kansas City. That city comes under this Act and has assumed the burden of supporting public transportation not only for the city but for the surrounding area. It thus appears that Jackson County is relieved of the obligation of supporting mass transportation within its borders.

█ It is further suggested by plaintiff that the Act authorizes the expenditure of a portion of the tax receipts for roads and bridges and that every county in the state needs money for those purposes. We do not find that argument convincing. In the first place there is no evidence to support it and secondly, as we have heretofore pointed out, the primary and compelling reason for passage of the Act was to support public mass transportation. In support of his contention on this point plaintiff relies primarily on Reals v. Courson, 349 Mo. 1193, 164 S.W.2d 306 (1942). Portions of that case were overruled in Walters, supra. The remaining part of the case is not applicable because it relates to school district bond issue authorization and presents a situation distinguishable from that here involved. The other cases cited are from other states and to the extent they might be applicable are not convincing.

We rule that the classification involved in this point was not arbitrary and unreasonable in the respects suggested by plaintiff.

As stated in his brief plaintiff's final contention is that "The court erred in finding that the greater concentration of population, complexity of governmental organization, and transportation requirements of . . . [the three metropolitan classes], as opposed to other cities of over 500 population, made it reasonable to provide for different methods of imposing a sales tax for transportation services in differing governmental units because the subclassification of the specified cities and counties in which no vote was required was discriminatory, arbitrary and unreasonable in that it provided to St. Louis County . . . the authority to impose the tax without voter approval and thereby denied to appellant, as a qualified voter in a city of 500 or more inhabitants in St. Louis County, the right to indicate his approval or disapproval of the said tax."

Plaintiff apparently is raising an equal protection question based upon the fact that under the provisions of this law a sales tax was imposed upon sales made in the city in which he resides without requiring approval by the voters of said city while such a tax could not have been imposed in cities of comparable size not located in St. Louis County without voter approval. He has cited Curtis v. Board of Supervisors of Los Angeles County, 7 Cal.3d 942, 104 Cal.Rptr. 297, 501 P.2d 537 (1972) in which the court stated that " '[B]ecause of the overriding importance of voting rights, classifications "which might invade or restrain them must be closely scrutinized and carefully confined" where those rights are asserted under the Equal Protection Clause.' " Also cited is Dillenburg v. Kramer (9th Cir. 1972), 469 F.2d 1222. That case involved an attack

upon a statute which denied voting rights to unpardoned persons convicted of a felony. The court held that the complaint raised a substantial federal question which required the convening of a three judge district court. In so ruling the court stated that " 'To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. . . . [I]t is certainly clear now that a more exacting test is required for any statute which "place[s] a condition on the exercise of the right to vote." . . . [I]f a challenged statute grants the right to vote to some citizens and denies the franchise to others, "the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest." ' " 469 F.2d 1224. While those cases state important principles we do not consider that they are strictly applicable to the type of voting question before us.

■ "The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. The test is whether the difference in treatment is an invidious discrimination. Harper v. Virginia Board of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169. Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351, (1973). In 16 Am.Jur.2d Sec. 510, pp. 893, 894, it is stated that " . . . it is well settled that the Constitution of the United States in securing the equal protection of the laws does not prohibit legislation which is limited as to the territory within which it is to operate. . . . In the absence of restrictions contained in state constitutions, the legislature may determine within broad limits whether particular laws shall extend to the whole state or be limited in their operation to particular portions of the state. . . . It is only necessary that there be reasonable basis for the limitation or differentiation and that all persons similarly situated in the same territory be treated alike."

■ We have heretofore held that there was a reasonable basis for the provision that the class which includes St. Louis County be permitted to levy the tax without referring the matter for voter approval. We now are considering the validity of the provision that if, in effect, St. Louis County shall levy the tax no municipality located therein shall levy same. We are firmly of the view that there was a logical and reasonable basis for that provision. St. Louis County is densely populated. It contains 103 cities and towns, of which 87 have a population of more than 500, most of which are located in close proximity to each other. By comparison, Jackson County has 15 cities containing more than 500 people. See Missouri Official Manual 1973–74, p. 1510, et seq. It should be obvious that for 87 cities which are closely related and perhaps adjoining to individually undertake a program of mass transportation taxation would result in confusion, inequity and inefficiency. For example, one city might levy the tax and contribute to Bi-State while an adjoining city would fail to do so and obtain the same transportation benefits while its merchants also receive a trade advantage.

We accordingly rule that the provision in question did not violate the equal protection provision of the Constitution and is accordingly valid. If plaintiff had been denied the right to vote while other citizens of his city or county were permitted to do so he would have cause to complain. Here, however, all citizens of St. Louis County were treated alike by a provision based upon a reasonable classification.

Judgment affirmed.

All concur.