Robert **BARTLETT**, et al., Appellants,

v.

**BI–STATE DEVELOPMENT AGENCY, Respondent.**

Robert **BARTLETT**, et al., Respondents,

v.

**BI–STATE DEVELOPMENT AGENCY OF MO–ILL METRO, Appellant.**

Nos. 59469, 59537.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 7, 1992.

Ronald Craig Gladney, Clayton, Carolyn M. Kopsky, St. Louis, for appellants.

Robert E. McWilliams, Jr., Alan D. Pratzel, St. Louis, for respondent.

SATZ, Judge.

This is an action for declaratory judgment and injunctive relief. Plaintiffs, in their individual capacities as taxpayers, sued defendant, Bi–State Development Agency of the Missouri–Illinois Metropolitan District (Bi–State), in a two count petition. The issues in both counts stem from a contract between Bi–State and Mayflower Contract Service, Inc., (Mayflower), under which Mayflower provides buses, bus operators and maintenance personnel for transportation service on the Lindbergh Bus Line in metropolitan St. Louis.

In each count of their petition, plaintiffs, in effect, requested the trial court to declare the contract between Bi–State and Mayflower invalid: in Count I, on the ground that public funds may not be used to pay a private company for providing "traditional public mass transportation"; and, in Count II, on the ground that members of the Bi–State Commission used an improper voting procedure to award the contract to Mayflower. In both Counts, plaintiffs also requested that Bi–State be enjoined from using public funds to privatize public transportation, generally, in Count I, and specifically, as to Mayflower, in Count II.

The case was tried on stipulated facts. The trial court entered judgment in favor of Bi–State on Count I but entered judgment in favor of plaintiffs on Count II. Plaintiffs appeal from the former judgment, and Bi–State appeals from the latter. We affirm the judgment in Count I and find the issues in Count II to be moot.

### Count I

The issue in Count I turns on the interpretation of the 1973 Transportation Sales Tax Act (Act), §§ 94.600 *et seq.*[1] The Act authorizes a city or county government to impose a sales tax to be used only for the "transportation purposes ... enumerated" in the Act. §§ 94.605.1 and 94.645.1. The tax proceeds may be paid directly "to an interstate transportation authority ... for its general purposes in providing a public mass transportation system"...." § 94.-645.2. "A public mass transportation system" is a "transportation system ... owned and operated by an interstate transportation authority...." § 94.600(8). In short, the Act enables the City of St. Louis and St. Louis County to raise funds by a tax, and the funds so raised may be paid "to an interstate transportation authority" for providing a "transportation system" the authority owns and operates.

The parties agree that Bi–State is an "interstate transportation authority" and also agree that Bi–State entered into a contract with Mayflower, under which Mayflower provides the buses, the bus operators and maintenance personnel for transportation on Bi–State's Lindbergh Line.

Since Mayflower provides the buses and necessary personnel for transportation on the Lindbergh Line, plaintiffs contend, Bi–

---

1. All statutory references are to RSMo 1986 unless otherwise stated.

State no longer "owns and operates" that Line as required by the Act. Had the General Assembly intended to permit Bi-State to contract all or part of the mass transportation system to a private contractor, plaintiffs contend, the General Assembly would have used the terms "supervised" or "owned and operated at least in part" instead of using the phrase a transportation system "owned or operated" by an interstate transportation authority.

Bi-State counters that the statutory provisions in question refer to "a transportation *system* owned and operated by an interstate transportation authority." (Emphasis added). This reference, Bi-State contends, is to an entire transportation system and not just one route or line, like the Lindbergh Line in question. Moreover, Bi-State describes the detailed contractual constraints imposed on Mayflower, which, to Bi-State, show it "retains control over almost every aspect of the Lindbergh Line," and, therefore, show it still continues to "own and operate" that Line.

Neither plaintiffs nor Bi-State, however, focus on the history of the compact which created Bi-State. The compact and its history resolves the issue in Count I in Bi-State's favor, without the need to determine the precise legal limits of the phrase "owned and operated" or the precise legal effect of the contract in question.

Bi-State is, as its name implies, a bi-state agency, "a body corporate and politic", created in 1949 by an interstate compact between Missouri and Illinois, which is now codified in §§ 70.370 through 70.440, RSMo 1986. Initially, Bi-State was not expressly authorized to own or operate a public transportation system. However, by a 1959 amendment, it was authorized "to acquire ... and to ... operate and maintain, or lease to others for operation and maintenance, ... passenger transportation facilities, and ... motor vehicle and other terminal or parking facilities." § 70.373. Thus, the compact clearly authorizes Bi-State "to operate and maintain ... passenger transportation facilities" or "to lease [passenger transportation facilities] to others for operation and maintenance."

Moreover, although not shown by the present record, Bi-State and others interpreted "passenger transportation facilities" to include the operating rights and property of transit companies and exercised this authority to acquire the operating rights and property interests of private transit companies operating in metropolitan St. Louis and in nearby counties in Illinois. See *Bi-State Development Agency—Purchase—Vandalia Bus Line, Inc., et al,* 93 M.C.C. 579 (1964). The purpose of these acquisitions, apparently, was to provide a unified mass transportation system which, by reducing duplication, would halt or stem the deterioration of mass transportation and enable the unified system to operate at a profit rather than at a loss. *Id.* at 582–592; *see also, Bopp v. Spainhower,* 519 S.W.2d 281, 286 (Mo. banc 1975). However, as is "widely known", the Bi-State system, like other urban transportation systems, found it difficult, if not impossible, to operate without incurring a loss. *Bopp* at 286. The "situation ... [became] increasingly more serious, financially", and the need for subsidization of these urban transportation systems by public funds became clear. *Id.* In Missouri, this funding was authorized in 1973 by the Transportation Sales Tax Act. § 94.600 *et seq.*

Clearly, then, prior to the Act being passed, Bi-State had the authority either "to operate and maintain" a transportation system or "to lease" that system "to others for operation and maintenance." § 70.373. The purpose of this grant of authority was equally clear: to provide more effective mass transportation and to do so at a profit, rather than at a loss. When Bi-State could not provide this transportation system at a profit, our General Assembly passed the Act to make up the deficit. It would be irrelevant to the General Assembly whether Bi-State operated the system itself or through others by contract. The focus was on Bi-State's profit and loss statement and only incidentally on the method Bi-State used to carry out its authority to provide a mass transportation system.

We must read the statutory language in issue in the light of the legislative purpose to provide an economically viable transportation system. Thus, when the General Assembly defined "a public mass transportation system" as a "transportation system ... *owned and operated* by an interstate transportation authority ...", (emphasis added), § 94.600(8), it must have contemplated transportation being provided by Bi-State directly or by contract to others. Here, Bi-State awarded the contract to Mayflower only after Bi-State had evaluated a number of sealed bids and determined that Mayflower was the lowest bidder and could provide the required services more economically than Bi-State or any other bidder. Thus, to us, this award clearly was consistent with the legislative purpose manifested in the Bi-State Compact, § 70.-370 *et seq.*, and in the Act. §§ 94.600 *et seq.*

### Count II

In Count II, plaintiffs alleged that the Bi-State Commissioners used an improper method to award the contract in issue, contrary to the specific provisions of § 70.370.

Bi-State is governed by ten commissioners; five chosen from Missouri and five chosen from Illinois; all of whom must reside within the bi-state district. § 70.-370, Art. IV. Unless otherwise provided by the legislatures of both Missouri and Illinois, no action taken by Bi-State is binding "unless taken at a meeting at which at least three members from each state are present, and unless a majority of the members from each state present at [the] meeting shall vote in favor" of the action. § 70.370, Art. V.

Prior to the meeting at which the Mayflower contract was awarded, Bi-State adopted a "by-law" permitting any commissioner to participate in a meeting of the Bi-State Commissioners by means of conference telephone or similar communication equipment. At the meeting awarding the contract to Mayflower, five commissioners from Illinois and four commissioners from Missouri were physically present. Four of the five Illinois commissioners voted in fa-

vor of awarding the contract to Mayflower, but only two of the four Missouri commissioners physically present voted in favor of the award. A third Missouri commissioner was not physically present but was connected into the meeting by telephone. He voted in favor of the award by phone. Without his vote, the contract award would be void.

Plaintiffs contend § 70.370 requires a commissioner to be physically present at a meeting in order for his or her vote to be valid, if, as here, the bi-state legislatures have not provided otherwise. Bi-State contends that § 70.370 does not apply to "by-laws ... for the operation of ... internal affairs."

The trial court found the by-law to be invalid but granted Bi-State "an opportunity to ratify their action [in awarding the contract] by a proper majority", within 90 days of the date of its order. The parties agree that the Bi-State Commissioners did so with the proper number being present and voting. This issue of telephone voting, therefore, is moot, and we need not and do not address it. *Gilroy-Sims v. City of St. Louis*, 697 S.W.2d 567, 569 (Mo.App.1985).

Judgment on Count I affirmed. Bi-State's appeal from the judgment on Count II is dismissed as moot.

SMITH, P.J., and CARL R. GAERTNER, C.J., concur.