Jacob ADAMS and Glen Akers et al., Appellants,

v.

The CITY OF ST. LOUIS and John K. Travers, Respondents.

No. 59745.

Supreme Court of Missouri, En Banc.

April 10, 1978.

**772**

Morris J. Levin, Gerald Kretmar, St. Louis, for appellants.

James J. Wilson, Associate City Counselor, St. Louis, for respondents.

RENDLEN, Judge.

This appeal, involving construction of the revenue laws of the State and the City of St. Louis comes here under Art. V, § 3, Mo.Const. (1945) as amended. See *Petrolene v. City of Arnold*, 515 S.W.2d 551, 552[1] (Mo.1974). Plaintiffs, who are employees or former employees of General Motors Corporation (GM) and members of the United Auto Workers (UAW), brought their action against the City of St. Louis (City) and its Collector of Revenue to recover earnings taxes paid under protest upon Supplemental Unemployment Benefits (SUB) received by them and to enjoin future collections and prevent prosecution of those failing to pay such tax.

SUB payments had been made to plaintiffs under the terms of a collective bargaining agreement between UAW and General Motors, the tax consequence of which turns on whether payments are "compensation earned," hence subject to the St. Louis Earnings Tax Ordinance, § 145.020, Revised Code, City of St. Louis. While the trial court denied relief and ordered plaintiff's petition "dismissed with prejudice" no substantial dispute exists concerning the essential facts, instead the issue becomes one of construction and application of the law.

The prime grant of taxing power to the state and its political subdivisions is contained in Art. X, § 1, of the Missouri Constitution, 1945, which declares:

> "The taxing power may be exercised by the general assembly for state purposes, and by counties and other political subdivisions under power granted to them by the general assembly for county, municipal and other corporate purposes."

Requisite enabling legislation for the City's earnings tax is found in § 92.110, RSMo 1969, providing in pertinent part:

"Tax may be levied on earnings and profits (St. Louis) Any constitutional charter city in this state which now has or may hereafter acquire a population in excess of seven hundred thousand inhabitants, . . . is hereby authorized to levy and collect, by ordinance, . . . an earnings tax on the *salaries, wages, commissions and other compensation earned* by its residents; on the *salaries, wages, commissions and other compensation earned* by nonresidents of the city for work done or services performed or rendered in the city; . . . ." [Emphasis added.]

Under authority of the statute, the City of St. Louis adopted the following ordinance imposing a 1% tax on salaries, wages, commissions and other earnings:

"Section 145.020 (Revised Code of The City of St. Louis)—A tax for general revenue purposes of 1% is hereby imposed on (1) *salaries, wages, commissions and other compensation earned* after July 31, 1959, by resident individuals of the City, . . . and on (2) *salaries, wages, commissions and other compensation earned* after July 31, 1959, by nonresident individuals of the City, for work done or services performed or rendered in the City; . . . ." [Emphasis added.]

The enabling statute and the taxing ordinance refer only to income received as compensation for services including salaries, wages, commissions and other compensation earned. In so doing, imposition of the tax is limited to earnings of the types designated because an ordinance or statute enumerating the subjects on which it operates is generally construed "as excluding from its effects all those not expressly mentioned." *Parvey v. Humane Society of Missouri*, 343 S.W.2d 678 (Mo.App.1961). In their brief defendants concede "[t]here is no question that the City of St. Louis cannot impose a tax upon *income* [emphasis added] as the enabling legislation . . . [does not] . . . authorize the imposition of such a tax." An earnings tax of the type under consideration has been described as ". . . a species of income or excise tax. However, it is limited to *earnings from work and services,* [emphasis ours] and does not include other kinds of income such as interest on investments, rents, dividends, capital gains and the like." *State ex rel. Agard v. Riederer*, 448 S.W.2d 577 (Mo.banc 1969). See also *Carter Carburetor Corporation v. City of St. Louis*, 356 Mo. 646, 203 S.W.2d 438 (banc 1947) and *Walters v. City of St. Louis*, 364 Mo. 56, 259 S.W.2d 377 (banc 1953). The issue is thus narrowed from the broad notion, "income" to the more limited concept, "earnings."

Defendant's principal argument is that benefits paid employees under the SUB plan are deferred compensation, earned by an employee "through acquisition of credit units while working but which is paid to him when he is unemployed," and thus are earnings subject to the tax. In response, plaintiffs contend SUB benefits are not earnings, deferred or otherwise, and are not within the circumscribed taxing authority of the City. An understanding of the plan is essential to a resolution of these issues.

The SUB plan grew from UAW's desire for a guaranteed annual wage during its 1955 contract negotiations with the nation's principal automobile manufacturers. From that collective bargaining process emerged, not the sought-after guaranteed annual wage but an agreement by which GM would pay at least five cents per employee-hour into an independent trust fund designed to supplement the members' unemployment payments during lay-off periods. The fund impinged on the wage offer and constituted part of an economic package, the cost of which affected resources available for other features such as wages, premiums, overtime, vacations, holidays, pension and insurance.

General Motors contributes to the fund, the employees do not and payments made cannot revert to the employer. When the fund attained a level at or above a maximum determined by the contract (a situation occurring in the late 1950's), GM was permitted to suspend payments; however, in such situations (under a 1961 amendment) the five cents per hour payments

were allocated to an alternative use. On at least one occasion, excess funds accumulated and were paid directly to employees as a year end bonus but this scheme for distribution of surplus was abandoned in 1967. Since that time the maximum level has never been reached and accordingly all employer payments have gone directly to the fund.

When the SUB plan was devised, it was not readily ascertainable whether its operation would render recipients ineligible for state unemployment benefits. To prevent that possibility a proviso was added that at least "⅔ of the states in which GM operated" must accept the "notion of supplementation," otherwise the payments would be diverted from the fund to other fringe benefits agreed by the UAW and GM, or if no agreement could be reached, to increase the hourly wage by that amount. Of significance is the provision that no benefit payments may be made if the fund falls below a prescribed level which produces a "first-come, first-served" quality with a potential for defeating claims asserted after the fund sinks below the agreed minimum.

Eligibility for SUB payments is conditioned on laid-off employees qualifying for state unemployment benefits, registering with the state unemployment office, (this includes being available for suitable work by an employer other than GM) and employees must have been laid off for lack of work. Payments do not diminish state unemployment benefits and the length of time an employee receives payment is determined from his credit units earned. No credit units may be earned until an employee has been employed for one year though they accrue thereafter at the rate of ½ unit for each thirty-two hour (or more) work week. On the other hand, the amount or magnitude of such payments is determined by the employee's prior earning rate.

The plan is a privately funded device providing eligible employees with a formulated percentage of their after tax wages when benefits are combined with state unemployment payments.

While it might well be argued that payments by GM into the fund constitute earnings (a point we do not decide), payments from the fund to laid-off employees are not for services rendered but instead are manifestations of the plan. Readily identifiable features distinguishing SUB payments from deferred earnings include the following: Benefit payments are made not by the employer but by an independent managing trustee free of control of General Motors; benefits are not for past services but for present unemployment; plaintiffs are not employees of the trust fund and it cannot be said that benefit payments result from any service rendered to the fund; employees have no fixed right to payments and in this respect such payments might be compared to insurance benefits paid on the occurrence of an event uncertain, reimbursing for a loss contemplated by a contract of insurance. By this we do not suggest the contingent right to claims is not of value, instead it appears that the predominantly contingent quality mandates that benefit payments are not earnings in the sense contemplated by the ordinance. In addition, some employees might never qualify for benefits though their "earnings" enter the fund. In contrast, some may receive benefits from time to time but in amounts less than contributions made to the fund for them.

Supportive of defendant's contention is the fact that employees earn the five cents per hour which GM diverts from direct wage payments into the fund and if the SUB plan ends, such monies will be added to wage payments or for such other purpose as the parties may agree. Further, it is by hours worked that employees acquire a contingent interest in possible future benefit payments. But after that point the quality of "earnings" in the usual sense is lost as employees' rights to benefit payments are contingent upon *inter alia*, the state's acceptance of the principal of "supplementation," adequacy of the fund, the employee's accrual of credit units, lay-off for lack of work, eligibility for state unemployment benefits and a variety of fortuitous factors, wholly beyond the employee's control.

■ Because the ordinance is a taxing measure, a strict interpretation of its terms is required. It is to be construed against the taxing authority and in favor of the taxpayer. *Wiethop Truck Sales, Inc. v. Spradling*, 538 S.W.2d 585, l.c. 587 (Mo. 1976); *Missouri Pacific Railroad Co. v. Campbell*, 502 S.W.2d 354, 358 (Mo.1973).

■ The term "earnings" has been defined as " 'the gains of the person derived from his services or labor without the aid of capital.' " *United Benefit Life Insurance Company of Omaha v. Zwan*, 143 S.W.2d 977, 980 (Tex.Civ.App.1940). As stated in the early case of *Jenks v. Dyer*, 102 Mass. 235 (1869), at page 236, "the return due for . . . services may properly be called earnings." Similarly, Webster's New World Dictionary, Second College Edition 1974, defines "earnings" as "money, etc., earned by labor or service." This court, in *Newman v. Rice-Stix Dry Goods Co.*, 335 Mo. 572, 73 S.W.2d 264, 270 (1934), interpreting the Missouri Workmen's Compensation Act, §§ 3305 and 3320, RSMo 1929, which provided that compensation was to be computed on the basis of "earnings which the injured person received as salary, wages, or earnings," stated: "[e]vidently the term 'earnings' following 'salary, wages' is used as meaning earnings of the same nature as those particularly specified, viz., salary or wages; that is, remuneration to the employee for his services." A similar language arrangement appears in the taxing ordinance at bar, to wit: that "salaries, wages, commissions and other compensation earned" are subject to the tax imposed. The ruling in *Newman* reinforces our view that the term "earnings" in the St. Louis ordinance is used in the limited sense of "compensation for services rendered" and that monies received as SUB benefits are dependent on so many factors other than *services rendered* by the employee that the process' final product is an amalgam which cannot be considered *earnings* in the strict sense. While SUB benefit payments have some characteristics of *income*, its array of qualities, atypical of "earnings", lead to the conclusion they are not "earnings" as that term is used in the ordinance.

Finally, our attention is directed to the actions of several administrative bodies which have considered SUB payments and made rulings thereon under other taxing laws. We have also been referred to tax rulings concerning benefit schemes other than the SUB plan, which it is argued are analogous and useful when considering the issue at bar. In this connection such rulings, though not controlling, "are entitled to respectful consideration. . . ." *Northeast Osteopathic Hospital v. Keitel*, 355 Mo. 740, 197 S.W.2d 970, 974 (1946). Some examples are: (1) SUB payments have not been treated as wages by the Missouri Division of Employment Security in determining eligibility for unemployment benefits, (2) Nor have they been considered wages by the Internal Revenue Service in administering the (a) Federal Unemployment Tax Act,[1] (b) the Federal Insurance Contributions Act,[2] or (c) for the Collection of Income Tax at Source on Wages.[3] See Rev.Rul. 56–249. (3) Benefits received by an employee under a health or accident insurance policy provided by his employer are not included in gross income for Federal Income Tax purposes if paid: (a) to reimburse the employee for expenses of medical care, (b) for the permanent loss or loss of use of a part of the body, and (c) certain disability payments to those who retire before sixty-five because of disability,[4] (4) Workmen's Compensation benefits are excluded from gross income,[5] and (5) Gross income has been determined not to encompass unemployment benefits paid by a state agency,[6] (6) The Missouri legislature has exempted from state income taxes unemployment benefits paid to workers under

---

1. Int.Rev.Code of 1954, § 3301 et seq.

2. Int.Rev.Code of 1954, § 3101 et seq.

3. Int.Rev.Code of 1954, § 3401 et seq.

4. Int.Rev.Code of 1954, § 105.

5. Int.Rev.Code of 1954, § 104(a)(1).

6. Rev.Rul. 70–280.

the provisions of the Missouri Employment Security Law.[7] See § 143.121, RSMo Supp. 1977, which defines (subject to minor modifications not here pertinent) the Missouri adjusted gross income the same as the federal adjusted gross income. On the other hand, SUB plan payments have been considered taxable as *income*, for federal income tax purposes under Rev.Rul. 56–249. This, however, has little persuasive value here for the reasons of the distinction, previously discussed, between the terms income and earnings.

We hold that City earnings taxes paid under protest by plaintiffs on supplemental benefits received in 1974 are not subject to the provisions of § 145.020(1) and (2), Chapter 145 of the Revised Code of the City of St. Louis and that amounts so paid by plaintiffs must be refunded to them. That defendants are enjoined from making or imposing any levy or assessment of earnings tax under said ordinance on Supplemental Unemployment Benefits paid under the plan to employees of GM or from prosecuting or attempting to prosecute plaintiffs or others who receive such benefits for failure to pay such earnings tax thereon. The cause is remanded to the trial court that judgment may be entered consistent with the terms of this opinion.

MORGAN, C. J., and HENLEY, FINCH, DONNELLY and SEILER, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

BARDGETT, Judge, dissenting.

I respectfully dissent. On the facts stated in the principal opinion, I conclude that the sums of money in issue are "earnings" as that term is used in sec. 92.110, RSMo 1969, and are "wages" or "other compensation earned" as those words are used in sec. 145.020, Rev.Code of the City of St. Louis. These are not fringe benefits that come to the employee in some form other than hard cash but payments of cash to the employees of General Motors from a fund to which General Motors made payments on the basis of work done by the employees. The employees then have the right to draw on the fund for money should certain contingencies arise. I would hold these payments are "compensation earned" and taxable under the ordinances when received by the employees.