**Edgar TOOLE, Jr., Appellant,**

**v.**

**Jerome JONES, Superintendent of Schools, et al., Respondents.**

**No. 55208.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 1, 1989.

Application to Transfer Denied
Nov. 14, 1989.

Richard C. Homire, St. Louis, for plaintiff/appellant.

Kenneth C. Brostron, Jeffrey L. Lowe, St. Louis, for respondents.

GRIMM, Presiding Judge.

Jerome Jones, superintendent of the St. Louis Public Schools, suspended Edgar Toole, Jr., from his tenured teaching position as an Assistant Naval Science Instructor. Thereafter, on Jones' recommendation and following a hearing, the Board of Education terminated Toole's employment. Toole's termination was affirmed by the Circuit Court.

Toole's brief on appeal contains two points relied on. First, there was no competent and substantial evidence that either Toole's school principal or Naval Science Instructor had authority to order him to go on extended field trips; because the order (1) is not supported by CNETINST 1533.9F, (2) is in conflict with the Superintendent's Statement of Personnel Practices, and (3) is not authorized under Toole's Permanent Teacher Contract. Second, Toole was discriminated against in violation of the Fourteenth Amendment to the Constitution; because the procedure for terminating a teacher in a metropolitan district is differ-

ent than the procedure in all other districts. Finding no error, we affirm.

Our review of the Board's action is limited:

'The reviewing court may only determine whether the board could reasonably have made its findings and reached its result or whether the decision was clearly contrary to the overwhelming weight of the evidence. [citation omitted]. The court may not substitute its judgment on the evidence and may not set aside the board's decision unless it is not supported by competent and substantial evidence on the whole record. In addition, the evidence must be considered in a light most favorable to the board's decision, together with all reasonable inferences which support it. [citation omitted]. If evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding. [citation omitted]. Also the determination of the credibility of the witnesses is a function of the administrative tribunal.'

*Board of Educ., Mt. Vernon Schools v. Shank,* 542 S.W.2d 779, 781–82 (Mo.banc 1976) (quoting *Merideth v. Board of Educ. of Rockwood R–6 School Dist.,* 513 S.W.2d 740, 745 (Mo.App.E.D.1974)). Viewing the record in light of these principles, there is competent and substantial evidence to support the conclusion that there was authority to order Toole to go on extended field trips, and that Toole refused to go.

As required by *Shank,* we must consider the evidence "in a light most favorable to the board's decision." The evidence discloses that in 1980, the Board contracted with the Department of the Navy to establish a unit of the Naval Junior Reserve Officers' Training Corps. Although the NJROTC program is under the direct control of the Board, it is subject to Navy rules and regulations.

The contract requires the program be directed by a Naval Science Instructor (NSI). One or more Assistant Naval Science Instructors (ANSI) must also be employed by the Board. The NSI and ANSIs must be retired officers or enlisted personnel from the Navy, Marine Corps, or Coast Guard, approved and certified by the Chief of Naval Education and Training (CNET).

The principal at the school where the program began was John Close, Clinton Land was the NSI. Apparently there were three ANSIs, including Toole.

Under Land's leadership, he and the ANSIs would meet each August and plan field trips for the year. After the locations of the trips were determined, Toole said Land would ask "who wants to go on what field trips, and each one of [the ANSIs] stated [a] preference." According to Toole, "if there was a question about who was going on what field trip, we might flip a coin or I might say, well, I really don't want to go on that one, you go, John, but we agreed among ourselves who was going on what field trip."

In 1985, Ivory Lofton replaced Close as principal. Thereafter, Betty Gabryshak replaced Land as NSI. She had previously been an ANSI for four years with Toole.

Gabryshak scheduled field trips for the 1986–87 school year. Unlike the previous NSI, she did not hold a meeting to determine the ANSIs' preferences. Rather, she circulated a memorandum to the ANSIs, indicating that two persons were needed for each trip and they should sign up for those trips in which they were interested. The memorandum also said, "if you do not sign up, you will be assigned."

The sign-up memorandum was routed to the ANSIs on the basis of prior military rank. Toole thought this was unfair, since all were now civilians and not military personnel. As a result of this routing method, Toole said he "must have been the next-to-the-last person to get [the memorandum]."

According to Toole, there were six trips on the list. When he received the list, two people had already signed up for each trip. Toole said he "didn't want to go on any of the trips and [Gabryshak] had ample volunteers, so I did not volunteer for any field trips, period."

With the exception of Toole, all the ANSIs signed up. Since Toole did not, Gabryshak assigned him to field trips to Pensacola, Florida, and Norfolk, Virginia.

The Pensacola trip was scheduled for December 15 through 18, 1986. The necessary form for Toole to sign to go on the trip was prepared, but Toole did not sign it. Gabryshak then met with Toole and discussed CNETINST 1533.9 with him.

CNETINST 1533.9 is the basic Navy regulation for the operation of NJROTCs. It sets forth guidelines for specific duties and responsibilities of the NSI and ANSI. Gabryshak discussed § 406b(7) with Toole. This section provides that an ANSI's duties include "[p]lanning and conducting extracurricular activities for NJROTC unit (including ... field trips, mini-boot camps, ship cruises, etc.)." Toole told her that he was not going on the field trip.

Gabryshak reported Toole's refusal to Principal Lofton. On approximately November 12, Lofton met with Toole. Lofton ordered Toole to go on the trip. According to Lofton, Toole said that he was not going and offered no reason for his refusal.[1] In a letter to Lofton concerning that meeting, Toole stated he "had no intentions of taking any extended out of town field trip with cadets in attendance unless adequate compensation was considered. [NSI] Gabryshak had been previously so informed."

On November 13, Lofton sent Toole a form to sign for the field trip. The form is titled "Request for Leave of Absence."

Lofton testified that this form is used to account for teachers when they are away from their assigned school building. According to Gabryshak, it is the standard application form used by ANSIs "on these field trips." Although the form's title and wording could cause confusion, there is no evidence that its format was previously questioned.

The form for the Pensacola trip shows that the purpose for the absence was "Navy orientation visit." It also shows that the absence was to be with salary. Toole would not have been charged with any time off by signing this form and taking the field trip.

On November 14, Lofton sent Toole another memorandum. In that memorandum, Lofton quoted paragraph 7 of CNETINST 1533.9F concerning an ANSI's duty and responsibility to plan and conduct field trips. He also pointed out that ANSIs are to follow orders, and he concurred with the NSI in assigning this trip to him. The memorandum concluded: "If you, at the time of this field trip, follow your current posture and refuse to go, you will be considered insubordinate and the appropriate disciplinary action will be instituted."

On December 15, the day the cadets left on the Pensacola trip, Toole reported to work, but did not go on the trip. Gabryshak went in his place.

That same day, Gabryshak filed a special evaluation of Toole with the CNET. She

---

1. In the spring of 1986, the ANSIs met with the Associate Superintendent for Personnel and discussed working conditions. There is no indication that any question was raised at that meeting as to whether ANSIs were required to go on field trips. On July 9, the Associate Superintendent responded in writing to the questions discussed at the meeting.

On August 27, Toole wrote the Superintendent, raising seven questions, including "Are ANSIs required to go on extended field trips? If so, what are the circumstances?" His letter then continues:

The above questions are not specifically addressed in CNET INSTRUCTION 1533. In a NJROTC "UNIT"; there will not normally be a "seniority" problem among the military staff; there will not normally exist "resentment" and "envy" between the military and civilian

staff; there will not normally be "conflict" between the ANSI and the NSI; ... there will not normally exist any reason for "comparing" salary; and there will not normally exist any reason to "question" field trips between or among ANSIs and the NSI.

His letter then mentions that the original three ANSIs receive only $1000 per year over the minimum salary, while newer ANSIs receive $2000. He requested a raise to $2500 per year over the minimum.

On September 22, a response was sent to Toole. It said that his first six questions were answered in the July 9 letter. As to his question about field trips, he was told to "discuss this matter with your immediate supervisor. It is this Office's belief that field trips are a performance requirement." His request for a raise was denied.

advised the CNET of Toole's actions, and requested that the CNET decertify Toole.

By letter dated February 17, 1987, the CNET advised Toole that the special evaluation, as well as evidence Toole submitted, had been reviewed. The letter continued:

Your NSI has responsibility to assign you duties within the guidelines of this instruction. "Planning and conducting extracurricular activities for [the] NJROTC unit (including ... field trips ...)" is a specific duty expected of all ANSI's in the NJROTC program. You cannot be an exception. Accordingly, you are advised that further refusal on your part to fulfill any duty properly assigned by your NSI will result in action to terminate your certification.

Toole continued as an ANSI, and was still scheduled to take the Norfolk trip on April 27. On March 23, Gabryshak called Toole to have him sign the necessary form. Toole told her that (1) he was not going, (2) he did not like the selection process, and (3) he did not like the idea of two ANSIs going. According to Gabryshak, Toole also said that he would say "he's not going because they're not paying him"[2] and that "he'll see us in court." Lofton also spoke with Toole and Toole refused to go; Lofton told Toole he would forward Toole's refusal to Lofton's superior.

On April 3, 1987, the Superintendent suspended Toole without pay. Two charges were set forth in the Statement of Charges which accompanied the suspension notice. The charges alleged violations of Board regulations 5210 and 5346. Regulation 5210 requires employees to "obey all lawful orders and directives issued by their superiors.... Failure to so act shall constitute insubordination in the line of duty." Regulation 5346 provides that such failure to obey "shall be grounds for disciplinary action against an employee, including dismissal."

The first charge specified failure "to obey a lawful order and directive issued by a superior, Ivory Lofton, ... that you accompany thirty-seven Cadets on an educational field trip to Pensacola, Florida, on December 15, 1986." In support of this allegation, the charge noted that Lofton directed Toole to sign the appropriate form, but that the form was returned unsigned.

The second charge specified failure "to obey a lawful order and directive issued by a superior ... Gabryshak, that you complete and execute appropriate forms to accompany Cadets on an educational field trip to Norfolk, Virginia, on April 27, 1987." The charge noted that Gabryshak contacted Toole about the forms, and that Toole told Gabryshak that he was not going on the trip because he was not getting paid.

Toole's first point on appeal is that the "Superintendent failed to show by competent and substantial evidence that Principal Lofton or N.S.I. Gabryshak had authority to order [Toole] to volunteer[3] for an extended field trip." Toole alleges that the order (1) is not supported by CNETINST 1533.9F, (2) is in conflict with the Superintendent's Statement of Personnel Practices, and (3) is not authorized under Toole's Permanent Teacher Contract.

**2.** As with the Pensacola trip, the form provided that Toole was to receive his salary while on this trip.

**3.** The record is replete with references to the word "volunteer." It is clear, however, that the word was not used in its ordinary sense. Rather, it was used in the sense of expressing a preference for assignment to particular field trips.

Toole's testimony supports this interpretation. Under the first NSI, the NSI and ANSIs met, and according to Toole, "agreed among ourselves who was going on what field trip." Toole said the NSI "asked who wants to go on what field trips, and each one of us stated our *prefer-* ence." (Emphasis added). Later, Toole was asked; "Did you volunteer for some of these [earlier] field trips?" Toole responded, "I *volunteered* for every one that I went on." (Emphasis added).

This interpretation is also supported by Gabryshak's testimony concerning her procedure. She said, "we need two persons per trip and [ANSIs] please sign up for those that you are interested in, because quite frankly some people are not interested in going to see aviation, or submarines or whatever, and when this happens, I also say that if you do not sign up, you will be assigned." One would not be subject to assignment if the trips were purely voluntary.

■ Toole does not argue that the school principal and the NSI were not in supervisory positions over him. Rather, his first allegation is that the order is not supported by CNETINST 1533.9F. As noted earlier, section 406b(7) of CNETINST 1533.9F establishes guidelines for "specific duties and responsibilities of the ANSI." That section provides that an ANSI's duties include planning and "conducting" field trips. Section 406 also provides that ANSIs "shall perform such duties as may be assigned them by the NSI." Contrary to Toole's allegation, CNETINST 1533.9F supports the order.

Toole further argues that CNETINST 1533.9F is applicable only to those situations where there is a single unit of NJROTC in a school. He contends that it does not apply when, as here, an entire school is devoted to NJROTC.

Congress established minimum requirements for schools to qualify for a NJROTC program. It did not, however, establish a maximum number of students allowed in a unit. 10 U.S.C. § 2031 (1989). Toole does not refer us to any statute, regulation, or decision placing such a limitation on the applicability of CNETINST 1533.9F.

Further, in an August 27, 1986 letter to the Superintendent, Toole stated that from the time the program commenced in 1981, "insofar as possible, we began in compliance with CNET INSTRUCTION 1533." Finally, the CNET's February 17, 1987 letter to Toole specifically directed him to comply with CNETINST 1533.9F, thus indicating that the CNET also applied that regulation to the activities at the school.

■ Toole next alleges that the order conflicts with the Superintendent's Statement of Personnel Practices of July 9, 1986. He points to a provision in that document that the ANSIs' work day schedule shall be the same as for all other regular classroom teachers. Further, the document provides that working conditions approved for regular teachers are applicable to ANSIs. Toole argues that ordering an ANSI to go on an extended field trip violates that policy.

Requiring an ANSI to go on extended overnight field trips does not violate that policy. The Associate Superintendent for Personnel testified that some of the district's classroom teachers are required to go on extended overnight field trips.

We also note that the meeting which preceded the July 9 memorandum was called to discuss the ANSIs' personnel concerns. Before that meeting, at the request of the Associate Superintendent for Personnel, Toole set forth specific concerns and those concerns were discussed. Nothing in the record indicates that a concern was raised as to whether ANSIs were required to go on field trips.

It is understandable that no such concern was raised. Toole testified that, from the very beginning of his employment, field trips were a part of the program. He said he did not know how many field trips he had taken, whether it "was ten, fifteen, twenty, I really don't know, but we went on x-number of field trips each year depending on what we thought was sufficient to keep the kids interested in the program." Further, Toole said that he "agreed to go on field trips at no cost to the Navy, because we had to do this in order to keep the job." Thus, the Board could have reasonably believed that Toole knew that extended field trips were a requirement of the position. The July 9 memorandum is not in conflict with this long standing requirement.

■ Finally, under this point, Toole alleges that the order was not authorized under his Permanent Teacher Contract. This point was not developed in the argument section of the brief. Thus, it is deemed abandoned, and is denied. *Pate v. St. Louis Indep. Packing Co.*, 428 S.W.2d 744, 751 (Mo.App.E.D.1968); *LoPiccolo v. LoPiccolo*, 547 S.W.2d 501, 506 (Mo.App., E.D.1977); *see Bopp v. Spainhower*, 519 S.W.2d 281, 286 (Mo.banc 1975).

Moreover, the record does not support Toole's allegation. As previously indicated, the Associate Superintendent of Personnel testified that as part of their performance requirement, some of the district's teachers are required to go on extended overnight

field trips. For cases discussing assignment of teachers to supervise trips, see, e.g., *Parrish v. Moss*, 106 N.Y.S.2d 577, 200 Misc. 375 (N.Y.Sup.Ct.1951), *aff'd* 279 A.D. 608, 107 N.Y.S.2d 580 (N.Y.App.Div. 1951); *District 300 Educ. Ass'n. v. Board of Educ. of Dundee Community Unit School Dist. No. 300*, 31 Ill.App.3d 550, 334 N.E.2d 165 (1975); *McGrath v. Burkhard*, 131 Cal.App.2d 367, 280 P.2d 864 (1955). Point denied.

▮▮▮ Toole's second point relied on alleges that he was denied procedural and substantive due process rights, as well as equal protection rights, because he was employed in a metropolitan school district. These denials, he alleges, result from the "radically different" procedures for terminating teachers in a metropolitan district compared to those used in all other school districts.

We first observe that suspension and termination of teachers in a metropolitan school district [4] is regulated by § 168.221, RSMo 1986. This regulation was recognized in Toole's Permanent Teacher Contract. The Board and Toole specifically agreed that Toole would be "subject to removal only as provided in Section 168.221 R.S.Mo."

The pertinent portions of § 168.221 have been in existence since at least 1963. The probationary period for teachers and principals is three years. § 168.221.1. Permanent teachers and principals may be removed only for a cause delineated in § 168.221.3. The Board has the authority to fire a teacher "for a one time violation of Board regulations, even in the absence of a showing that the violation was willful." *Westbrook v. Board of Educ.*, 724 S.W.2d 698, 701 (Mo.App.E.D.1987).

Suspension and termination of non-metropolitan school district teachers is regulated by § 168.114, RSMo 1986. The probationary period for these teachers is five years. § 168.104(5), RSMo 1986. A permanent teacher may be terminated only for a cause described in § 168.114. If the cause is "incompetency, inefficiency, or in-

subordination in line of duty," a 30 day advance warning is required. § 168.116.2, RSMo 1986.

Preliminarily, Toole argues that the circuit court erred in holding that § 168.221 is controlling. The court did not err. *See Westbrook, supra*, at 701.

Toole further states that teachers in non-metropolitan school districts are afforded "greater procedural protection" than teachers in metropolitan school districts. This, he argues, violates the equal protection clause.

To establish such a violation, Toole must prove "that there is no rational connection" between the General Assembly's classification of school districts and its objectives. *Harrah Indep. School Dist. v. Martin*, 440 U.S. 194, 198, 99 S.Ct. 1062, 1064, 59 L.Ed.2d 248, 254 (1979). Toole presented no evidence that the General Assembly's classification is irrational. His point is denied.

The judgment of the trial court is affirmed.

GARY M. GAERTNER, J., concurs.

KAROHL, J., dissents in separate opinion.

KAROHL, Judge (dissenting).

I respectfully dissent.

This is an appeal by a tenured school teacher after the circuit court affirmed a decision of the School Board of the City of St. Louis to discharge him because he violated Board of Education regulations 5210 and 5346. Our duty is to analyze the charges, the findings of fact and the conclusions of law and determine whether the decision of the Board is supported by competent and substantial evidence upon the whole record. *Bell v. Board of Education of City of St. Louis*, 711 S.W.2d 950, 955 (Mo.App.1986). The majority opinion cites the same standard. The standard of review is meaningful, however, only in light of the two charges, the findings of fact and

---

**4.** "Every city in this state, not within a county, ... constitutes a single metropolitan school district, and is a body corporate." § 162.571, RSMo 1986.

the legal conclusions of the Board. In my view the majority opinion does not analyze what was charged, what the district attempted to prove and what the Board found as support for terminating appellant's contract. Both charges allege Toole was directed to complete appropriate forms for an assigned field trip. The charges and the findings of fact which will be set forth verbatim required the district to prove it had authority to order Toole to sign a Leave of Absence form.

The majority opinion suggests that the form is used to account for teachers when they are away from their assigned school building. That is clearly not the purpose of the form nor was there evidence to support that reading. It is a form used by *the teacher to request* consideration for a leave of absence which may or may not be granted by school authorities. The true purpose of the form was never proven by any evidence, competent and substantial, or otherwise. The form is a contradiction in terms. If the Board had authority to order a teacher to make an extended field trip it had no need or authority *to order the teacher to* request permission to volunteer to make the trip. The majority opinion attributes confusion to the form. There is nothing whatever confusing about the form. It is clear and unambiguous. A copy is attached as Exhibit A. It is a form whereby the teacher can request the Board to permit him, or her, to be *absent from teaching duties* for: (1) personal illness; (2) for study; and, (3) for reasons other than illness or study, "(i.e.) educational conferences, personnel, military, etc." It is not a form to reflect teaching duties. If Toole was ordered to make an extended field trip and if the district had authority to order such trip then Toole would not have been absent he would have been on duty. It is important to note that the school district did not charge Toole on either charge with refusing to make a trip in a charge separate and apart from refusing to sign "appropriate personnel forms" and make the trip. In this light and under the appropriate standard of review the Board did not prove what it charged by competent and substantial evidence.

It should also be noted that the Board bore the burden of proof that Toole violated a lawful order. A determination of lawful necessarily implies proof of authority where authority is questioned. The majority opinion cannot and does not cite any proof of facts or legal authority that it can order a tenured school teacher in the City of St. Louis to leave the State of Missouri for any purpose whatever. The opinion acknowledges that the teacher contract provides no agreement for assigned duties out of the State of Missouri. The opinion relies upon some agreement between the school board and the Department of the Navy. That agreement does not require any *extended* field trips *outside* of the state of Missouri. The Board of Education had no contractual duty to conduct such trips. They were optional. Courts cannot add terms to a contract.

With these general observations in mind we look to Toole's first claim of error, "that the Superintendent failed to show by competent and substantial evidence that principal Lofton or N.S.I. Gabryshak [the person the charges alleged issued the orders] had authority to order plaintiff to volunteer for an extended field trip." The statement of charges was as follows:

You, Edgar Toole Jr., military science teacher assigned to the Cleveland Navy Junior ROTC Academy, are hereby charged with the following misconduct:

*Charge No. 1:* You violated Board of Education Regulations 5210 and 5346 (copies of which are attached hereto and incorporated herein by reference) in that you failed to obey a lawful order and directive issued by a superior, Ivory Lofton, Cleveland NJROTC Academy Principal, that you accompany thirty-seven Cadets on an educational field trip to Pensacola, Florida, on December 15, 1986. On November 13, 1986, Mr. Lofton *directed you by written memorandum to complete the appropriate forms* for the assigned field trip and return them to him no later than Monday, November 17, 1986. On November 17, 1986, you returned the forms to Mr. Lofton without the requested information, stating in

writing, "I must assume that if you have the authority to order me to take a trip, you also have the authority to grant or authorize the time required for the trip. Moreover, should I volunteer as an escort on a field trip, I will submit the appropriate forms."

*Charge No. 2:* You violated Board of Education Regulations 5210 and 5346 (referenced above) in that you failed to obey a lawful order and directive issued by a superior, Military Science Coordinator Lieutenant Commander Betty Gabryshak, *that you complete and execute appropriate forms* to accompany Cadets on an educational field trip to Norfolk, Virginia, on April 27, 1987. On or about March 23, 1987, LCDR Gabryshak contacted you to ascertain why you had not completed the forms. You informed her that you were not going on the Norfolk trip and, further, that you would tell the Captain, Jones, and whomever else, that you were not going because they were not paying you and that you will see us in court. (Our emphasis).

The relevant findings of fact and conclusions of law of the school board are as follows:

4. On or about November 13, 1986, Ivory F. Lofton, Cleveland NJROTC Academy principal, directed Edgar Toole to accompany 37 cadets on an educational field trip to Pensacola, Florida, scheduled for December 15, 1986. In conjunction therewith, Mr. Lofton requested that Edgar Toole complete the *appropriate personnel forms* and return them to him no later than November 17, 1986. Mr. Toole refused to obey the request and *returned the incomplete forms,* stating in writing, "I must assume that if you have the authority to order me to take a trip., you also have the authority to grant or authorize the time required for the trip. Moreover, should I volunteer as an escort on a field trip, I will submit the appropriate forms." As principal of the Cleveland NJROTC Academy, Ivory Lofton has ultimate supervisory responsibility for all employees assigned to his building location.

5. On or about March 23, 1987, Lieutenant Commander Betty Gabryshak requested completed forms for an educational field trip to Norfolk, Virginia, for which Edgar Toole had been assigned. Mr. Toole again *refused to complete the forms* and advised LCDR Gabryshak that he was not going on the Norfolk, Virginia, trip scheduled for April 27, 1987. He further advised that he would tell the Captain, Jones, and whomever else that he was not going because they were not paying him and he would see them in court. LCDR Gabryshak is jointly employed by the Board of Education as a military science coordinator and the U.S. Department of the Navy as a naval science instructor. LCDR Gabryshak has supervisory responsibilities for Mr. Toole. (Our emphasis).

\* \* \* \* \* \*

D. The conduct of Edgar Toole Jr., described in paragraph 4 of the above Findings of Fact, constitutes failure to obey the lawful order and directive of a superior, Principal Ivory Lofton, *to complete necessary forms* and to accompany 37 cadets on a field trip to Pensacola, Florida, and is therefore a violation of Board Regulations 5210 and 5346. It is the conclusion of the Board that Edgar Toole's violation of Regulations 5210 and 5346 in this instance is sufficiently serious standing alone to warrant his dismissal as an employee of the Board of Education of the City of St. Louis.

E. The conduct of Edgar Toole Jr., described in paragraph 5 of the above Findings of Fact, constitutes failure to obey the lawful order and directive of a superior, LCDR Betty Gabryshak, to *complete necessary forms* and to accompany cadets on a field trip to Norfolk, Virginia, and is therefore a violation of Board Regulations 5210 and 5346. It is the conclusion of the Board that Edgar Toole's violation of Regulations 5210 and 5346 in this instance is sufficiently serious standing alone to warrant his dismissal as an employee of the Board of Education of the City of St. Louis. (Our emphasis).

The narrow issue on this claim of error is whether the Board of Education proved by competent and substantial evidence that Toole failed to obey "lawful orders and directives issued by their superiors" as required by Board Regulation 5210 and was subject to discipline, including dismissal, under Board Regulation 5346. He claims he was fired for refusing to volunteer for two extended field trips.

We note, generally, that Toole was charged with failing to complete "appropriate forms" for extended field trips to begin on November 17, 1986 and April 27, 1987. The only "appropriate form" mentioned in evidence was a "LEAVE OF ABSENCE" form utilized by the school board. That form begins *"I request* a leave of absence in accordance with the regulations of the Department of Instruction as indicated below." (Our emphasis). Thereafter follow three columns denoting three separate categories for the request. They are: (1) for personal illness; (2) for study; and, (3) for reasons other than illness or study, "(i.e.) educational conferences, personal, military, etc." The form required a signature *and provides for a counter signature of approval* by a principal or director of personnel. Each category *requires* documentation and refers to "total school days *absent.*" Someone on behalf of the school board prepared the Leave of Absence form which Toole was ordered to sign. Toole's position before his superiors and the board was that he would not volunteer for extended field trips; and, the leave of absence form, in form and substance, was a document indicating a voluntary request. If Toole is not absolutely correct that the form was a device to volunteer then the words "I request" are rendered meaningless and execution of the document is a falsehood. Surely the conclusion the Board can fire a teacher for refusing to make a false statement to the Board is untenable. The majority opinion has that effect. It must be noticed the district and the Board made the execution of the form a critical event, the event tested by charge, findings and conclusion of law. We also observe that the form for the April, 1987 trip, prepared by a superior of Toole, does not state any reason in the "reason category." It merely notes a destination of "Naval Base, Norfolk, Va."

The charges and the findings are directed toward a failure to sign "appropriate forms," as charged, or "necessary forms" as set forth in the findings of fact. The record is barren to prove either that the Leave of Absence form was an appropriate or a necessary form. It is not possible from a study of all the evidence to determine the reason the Leave of Absence document was required. Further, the form of the Leave of Absence document is in the nature of a petition by a teacher subject to approval of a superior. Any allusion to use of the form to keep track of a teacher proves nothing if a teacher is on a trip planned and ordered by the Board. This is entirely inconsistent with the board's position that an ANSI teacher could be ordered to make extended field trips as a part of his teaching duties. It follows that an order that the teacher sign the document in order to comply with a part of his teaching duties is a contradiction in terms. If the Board or any superior had authority to issue a lawful order that Toole accompany students outside the State of Missouri on an extended field trip, no *teacher request* for leave approval of an absence was necessary. In the absence of evidence justifying the order, neither the board nor the circuit court was justified in speculating as to the reason for the directive to sign the form.

Significantly, prior to either of the orders of superiors to sign the Leave of Absence form and accompany students Toole requested from the Superintendent of Schools advice on whether ANSI's were required to go on extended field trips and, if so, under what circumstances. The reply was equivocal on whether "field trips" were required. Even if the expression of "belief" is sufficient, the answer did not address extended field trips, including those outside the school district and outside the State of Missouri. Nor did the reply respond by any advice on circumstances. This is particularly meaningful because the reply did not inform Toole that he had to volunteer by signing a request for leave of

absence. Accordingly, there was no evidence from which the board or the circuit court could find that the Leave of Absence form was appropriate or necessary as charged, but not proven, and as found.

The charges were not that Toole refused to make extended field trips. Both charges alleged Toole refused to complete the appropriate forms, the Leave of Absence form. Charge 2 is limited to this violation only. Charge 1 may appear different but it is not. It refers to a direction of November 13, 1986 from Mr. Lofton directed to Toole. The entire written memorandum dated November 13, 1986 reads as follows:

> Pursuant to our conference, you will find attached the appropriate forms to effectuate your Leave of Absence for your assigned field trip.
>
> The attached form shall be returned to my office not later than Monday, November 17, 1986.

This memorandum does not order Toole to make a trip. The evidence, taken as a whole, together with all reasonable inferences, is entirely silent on whether the Leave of Absence form which Toole admittedly refused to sign because he refused to volunteer was an appropriate or necessary form. In the absence of such evidence it is not possible to determine that the order to sign the form was "authorized" or "lawful."

It is not necessary for us to decide whether the School Board for the City of St. Louis has authority to require a teacher to accompany students outside the school district or outside the State of Missouri or both. This broader question is not resolved by evidence or any findings of fact or a conclusion of law. When asked, the Superintendent of Schools office did not define the circumstances under which permanent school teachers could be required to make such trips. The teacher contract executed by the Board of Education and Toole does not resolve this question and no legal precedent has been cited to this court to decide that question. Had there been evidence regarding the appropriateness or necessity for signing the Leave of Absence form then supporting evidence or legal authority of the board to order a teacher may have been necessary. The school board has cited no authority before this court to support the order. By its brief the board claims that the letter of Doris D. Eldridge, dated September 22, 1986, stated that extended field trips were a performance requirement for ANSI's. We have already noted it is not what the letter of September 22, 1986 accomplished. It stated only a "belief" and mentioned field trips, not extended field trips, if there is a difference. Further, it did not, as requested, define the circumstances under which extended field trips might be ordered. It did not define execution of the form as a circumstance. The more general question, the authority, if there was any, for the "belief," has never been noted in the record.

The majority opinion emphasizes Toole's responses but ignores the charges and findings. It also ignores the fact that he constantly informed authorities that he would not volunteer for extended field trips. He was never ordered to go except by signing a form which can have no meaning except "I volunteer." Accordingly, it makes no difference that he also requested additional pay and an alternative selection format. These were matters relevant to his decision whether to volunteer. If he was charged with refusing to make an extended field trip after a direct order that he make such trip and without regard to a preliminary, but integral part of the order that he sign the form volunteering to go, we would be reviewing a case that was never presented to the Board or to the circuit court, we would be reviewing the case which the majority reviews.

We are not authorized to make different findings for the Board than the Board itself made. Finding No. 5 does not mention any order to make an extended filed trip. It finds only that "Mr. Toole again refused to complete the forms." It does not find that he was ordered to make a trip on April 27, 1987 apart from completing forms. A full reading of finding No. 4 reached the same result but also discloses how the Board viewed Toole's position, as a person refusing to volunteer by noting his statement that if the Board had authority to

order him to take a trip it also had authority to grant or authorize the time required for the trip. In analyzing the two charges the majority opinion recognizes that the second charge involved only a lawful order and directive that he complete and execute appropriate forms. However, the opinion does not recognize that the first charge also included refusal to obey Mr. Lofton's directive to complete appropriate forms. Nor does the opinion recognize that the findings of fact in response to the first charge is a combined finding of refusing to execute the forms and to make the trip. This would account for the difference between finding proof of the charge by competent and substantial evidence and a finding that it was not proven by that standard.

The misdirection of the majority opinion is highlighted by the footnote regarding "volunteer." The majority relegates "volunteer" to an expression of preference for assignment to a particular field trip. That observation is incorrect. Proof of the fact that it is incorrect lies initially in charge No. 1 which quotes Toole's letter of November 17, 1986. Volunteer was used in the letter, in the charge and throughout the hearing, in its ordinary and usual sense of request for permission. It was used as the opposite of obeying a lawful order. The approach of the footnote totally ignores the charge the Board considered, the position of Toole, and the finding of the Board. In this respect, the word "appropriate" is very significant. That word was utilized in the charges and in the findings of fact. In the conclusions of law the Board changed the language to read "complete *necessary* forms." If the forms were not appropriate, and they clearly and patently were not, then they certainly were not necessary. There was no evidence from which the Board could find either that they were appropriate or necessary. It is both appropriate and necessary to face this issue to decide appellant's claim of error that school officials "had no authority to order plaintiff to volunteer for an extended field trip."

The majority opinion discusses the Superintendent's Statement of Personnel Practices of July 9, 1986. The difficulty with that discussion is that it ignores Tooles' argument that authorities could not order him to volunteer for extended field trips. That is how he was charged, that was the substance of the findings of fact and conclusions of law but that is not the subject of the discussion in the opinion. The Statement of Personnel Practices in July 9, 1986, does not mention a Leave of Absence form submitted by a tenured teacher who is *requesting* permission for an extended field trip. Any order that he sign such form is not supported by the Statement of Personnel Practices. The opinion contains a statement, "[n]othing in the record indicates that a concern was raised as to whether ANSIs were required to go on field trips." But, on August 27, 1986, Toole wrote a letter to Jerome B. Jones, Superintendent of Schools, in which he addressed seven questions to the superintendent. Question no. 7 was "Are ANSI's required to go on extended field trips? If so, what are the circumstances?" The letter or August 27, 1986, was Superintendent's Exhibit 5. Clearly, the record demonstrates that the concern was raised long before Toole was told to sign the Leave of Absence form and go on an extended field trip on December 15, 1986. An Assistant Superintendent of Schools responded by expressing a belief "that field trips are a performance requirement." No response to "extended field trips" was given and no response to the requested description of circumstances was made. The further statement that the Board could have reasonably believed that Toole knew that extended field trips were a requirement of the position is wholly unsupported because all trips prior to those which are the subject matter of Charge 1 and Charge 2 were handled on a volunteer basis. There was no evidence to the contrary. There was no evidence Toole signed a leave of absence form before prior extended field trips. Accordingly, the prior trips offer no support for the Board's belief, if it had one, that Toole knew extended field trips were a requirement of the position. The record is exactly the opposite.

Finally, the majority opinion says Toole abandoned reliance on his Permanent

Teacher Contract. On page 11 of the appellants' brief the following appears:

Toole had a permanent teacher contract with the Board of Education. (Superintendent's Exhibit 4). However, the court's order states as a finding that he was jointly employed by the Board of Education and the Navy. The evidence does not support this finding. The agreement between the St. Louis, Missouri Public Schools and the Navy is attached as Superintendent's Exhibit 7. The agreement states in paragraph O that 'the institution will give each N.J.R.O.T.C. instructor · a written contract which stipulates the duration of his employment, including identification of the specific periods during which the instructor will be performing duties in direct support of the N.J.R.O.T.C. program, and the amount of his salary.' (Superintendent's Exhibit 7 at page 2). The agreement further states: p ... 'in the event that the employing institution desires N.J.R.O.T.C. instructors to perform such other duties (i.e., non-N.J.R.O.T.C. classes or study halls) the institution will contract separate agreements with the N.J.R.O.T.C. instructor to perform such duties ...' (Superintendent's Exhibit 7 at page 3). By giving Toole a regular teacher contract the Board of Education was in direct violation of the very agreement under which the Board sought to force Toole to go on extended filed trips under Board authority.

The general claim of error was absence of competent and substantial evidence of authority to order plaintiff to volunteer. The specifics related to the Board agreement with the Navy, the Statement of Personnel Practices and the Permanent Teacher Contract. All were argued in the argument portion of the brief and none were abandoned. It is therefore necessary to view the contract which is an exhibit. The relevant provisions are: (1) the teacher shall serve as a permanent employee of the Board of Education; (2) teacher agrees to be in attendance at work beginning on the first scheduled day of duty and thereafter in accordance with the schedule established by the Board of Education for each school year; (3) teacher's employment shall be subject to all provisions of Missouri law applicable to permanent teachers employed by metropolitan school districts and to the rules, regulations, policies and policy statements of the Board of Education in effect during the school year. All such provisions are expressly made a part of the contract. It is evident that the trial court's finding that Toole was jointly employed by the Board of Education and the Navy is unsupported and incorrect. That finding is also in conflict with the agreement of the Board with the Department of the Navy. CNE-TINST 1533 .F 404(e) requires an ANSI to have "civilian status." It follows that the teacher contract controls and no military order is involved in the direction that Toole sign a Leave of Absence form and make an extended field trip.

In the absence of any proof representatives of the school district could order a permanent tenured teacher to request of the district a leave of absence the charges, the findings of fact and conclusions of law are unsupported by any evidence whatever. Nor could there have been such proof because the charges, findings and conclusions are contradictions in terms. Nor was this a mystery to the Superintendent or the Board. Toole informed the superintendent that if it had authority to order him to go then a request for permission to go initiated by Toole was not appropriate, necessary, or authorized. The charges alleged, as fact, that he was ordered to sign the forms, that he refused to sign the forms, but the forms were appropriate. More than words or the meaning of words such as "volunteer" is at stake. Fair treatment of an employee, under the law, is at stake. The school district never ordered Toole to make the trip except after signing forms. If the forms were appropriate or necessary the Board had every opportunity to prove why they were appropriate or why there were necessary. That is what they charged and found. Those findings are wholly unsupported by any evidence. The judgment of the trial court should be reversed. This court should remand with

instructions that the findings and conclusions of the School Board be reversed and that a hearing be held on appellants' application for unpaid wages.

## APPENDIX

**LEAVE OF ABSENCE**

or the City of St. Louis

for

Schools effective date.

DATE 4 Nov. 86

NAME Toole, Edgar Jr.

Please print last name first

POSITION Asst. Naval Science Instructor

I request a leave of absence in accordance with the regulations of the Department of Instruction as indicated below:

| For Personal Illness (Maternity - Child Care) | For Study | For Reasons Other Than Illness or Study (ie.) Ed. Conf., Personal, Military) etc. |
|---|---|---|
| From | From. . . . . . . . | From... 15 Dec. 86 |
| To | To. . . . . . . (Both dates inclusive) | To . . . . . 18 Dec. 86 (Both dates inclusive) |
| (Both dates inclusive) | Total School Days Absent. I am attaching hereto a statement certifying that I will enroll at the . . . . . . . | Total School Days Absent . . . 4 For the following reason· Navy orientation visit |
| Total School Days Absent Physician's Certificate should be attached with this request. | | |
| | College or University, and that I plan to earn at least eight semester hours of credit for each semester for which I have been granted a leave. Failure to comply with this regulation will be cause to cancel leave granted for study. | A letter should be attached explaining in detail the need for this request. (Any fees collected as a witness for court attendance should be refunded to the Board of Education if salary is allowed for absence). |

Mr Mrs

Official Signature

Cleveland NJROTC Academy

School

Naval Science

Grade or Subject

Euclid St. Louis, Mo. 63108

City Address      Zone No.

Pensacola, Fl.

Out of Town Address

361-8239

[X With

Telephone

APPROVED

Principal

☐ Without Salary

Director of Personnel

Dist. Supt./Authorized Administrator

Employees who have a leave terminating at the end of this school year are required to notify the Superintendent before June 1 (preferably by April 15) of their intention to return to service in September or of their desire to renew their request for a leave of absence.

SOCIAL SECURITY NUMBER | 256 | 30 | 3382 |