McKINLEY IRON, INC., Appellant,

v.

DIRECTOR OF REVENUE, STATE OF MISSOURI, Respondent.

No. 76638.

Supreme Court of Missouri, En Banc.

Dec. 20, 1994.

Carole Iles, John P. Barrie, Juan D. Keller, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gretchen Garrison, Asst. Atty. Gen., Jefferson City, for respondent.

LIMBAUGH, Judge.

McKinley Iron, Inc. (McKinley) seeks a ruling that its scrap metal processing business qualifies under § 144.030.2(12), RSMo Supp.1993, for an "electrical energy direct pay authorization" and an exemption from sales tax on its purchases of electricity. The Director of Revenue and, in turn, the Administrative Hearing Commission (AHC) determined this issue adversely to McKinley, which then sought review in this Court. Because resolution of the case requires construction of § 144.030.2(12), a revenue law, this Court has exclusive jurisdiction. Mo. Const. art. V, § 3. Appellate review is governed by § 621.193, RSMo 1986, which states that "the decision of the administrative hearing commission shall be upheld when authorized by law and supported by competent and substantial evidence upon the whole record...." The decision of the AHC is affirmed.

## I.

McKinley operates a scrap metal processing plant in the City of St. Louis. It processes raw scrap metal into densified scrap metal which can then be sold to customers who remelt it to make new metal products. This process begins when McKinley purchases scrap metal from numerous sources, including manufacturers, fabricators, salvage yards and contractors. Scrap metal for processing includes materials remaining after manufacturing processes, materials such as clippings, leftover stampings and the aluminum skeletons remaining after can lids are punched out of aluminum sheets. It also includes materials such as old automobiles, appliances and railroad cars that are obsolete or unusable.

After McKinley receives the scrap metal, it is weighed, screened for radioactivity, inspected to ensure that it contains no undesirable materials, segregated based on the type of metal it contains, and sorted by grade. Some of the scrap metal is cut by hand into smaller, more manageable pieces. After these processing steps, collectively referred to as sorting, grading and cutting, approximately 10–20% of the scrap metal is sold. According to the record, that 10–20% of the scrap metal need only be sorted, graded

and/or cut to be sold as densified scrap metal suitable for remelting. McKinley then utilizes five electric-powered machines to transform the size and density of the remaining 80–90% of the scrap metal. After this "densifying" process, this scrap metal is also sold as densified scrap metal suitable for remelting.

In April 1992, McKinley applied to the Director of Revenue for an electrical energy direct pay authorization pursuant to § 144.030.2(12), which provides an exemption from sales tax for purchases of:

> Electrical energy used in the actual primary manufacture, processing, compounding, mining or producing of a product, or electrical energy used in the actual secondary processing or fabricating of the product, if the total cost of electrical energy so used exceeds ten percent of the total cost of production, either primary or secondary, exclusive of the cost of electrical energy so used.

§ 144.030.2(12). The application and work sheet submitted by McKinley did not include the amount McKinley paid for the scrap metal in the "total cost of production." As a matter of internal accounting procedures, McKinley does not consider the cost of scrap metal to be part of its cost of production because scrap metal prices are subject to wide fluctuation beyond McKinley's control.

The Director, finding that the total cost of electricity used did not exceed ten percent of total cost of production, denied McKinley's application. In calculating that amount, the Director included the amount paid by McKinley for raw, unprocessed scrap metal. If, however, the cost of that scrap metal had been excluded, McKinley would have qualified for the exemption.

## II.

■ McKinley's first point is that the cost of the scrap metal should not be included in determining its "total cost of production." In support, McKinley sets forth three arguments: first, that it engages in two discrete stages of processing, that the cost of the scrap metal should only be included in the first stage, and therefore, the second stage

qualifies for the tax exemption; second, that even if it engages only in one stage of processing, it is *secondary* processing for which the cost of the material to be processed should never be included in the "total cost of production;" and third, that the term "total cost of production" as used in the scrap metal industry does not include the cost of materials.

### A.

■ For its first argument, McKinley relies on *State ex rel. Union Electric v. Goldberg*, 578 S.W.2d 921 (Mo. banc 1979), where this Court, construing § 144.030.3(11), RSMo 1969 (the predecessor to § 144.030.2(12)), stated that the language of the statute clearly shows an intention to exempt electrical energy used in either a primary or a secondary stage of production. *Goldberg*, 578 S.W.2d at 923. In *Goldberg*, this Court determined that taxpayer Meramec Mining Company engaged in two discrete stages of production, a primary stage of mining iron ore and a secondary processing stage of extracting the iron from the mined ore. In determining eligibility for the exemption, this Court held that each stage of production has its separate "total cost of production" against which the use of electrical energy is measured. *Id.* at 923–24. Because the cost of obtaining the ore was attributed to the "total cost of production" in the primary stage, the taxpayer was not required to include that cost a second time in the secondary stage. Therefore, the taxpayer qualified for the exemption under the secondary stage. *Id.*

McKinley contends, like the taxpayer in *Goldberg*, that it is engaged in two discrete stages of production, primary and secondary processing. Thus, McKinley argues that the cost of the scrap metal should be included only in the primary stage and that it is entitled to exempt electrical energy used in its secondary stage. According to McKinley, its first stage of processing occurs when the scrap metal is sorted, graded and cut, which by its account, enhances the value of the scrap metal and produces a product for which there is a market. At this point in the operation, McKinley states that it sells 10–20% of the product. The second stage of processing, McKinley contends, consists solely of "densifying" by use of the five electric-powered machines.

The question of whether McKinley is engaged in one or two stages of processing turns on whether sorting, grading and cutting the scrap metal constitutes a separate and independent stage of processing apart from the "densifying." Processing has been defined by this Court as "a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing." *Goldberg*, 578 S.W.2d at 924. Although most processing consists of a "series of acts," any one of which may, technically speaking, transform the material to a "different state or thing," it is not each transformation of the material that, in and of itself, constitutes processing. Instead the parameters of processing are determined by the "given result" or the "different state or thing" sought to be produced. Indeed, processing is not complete until the end product is produced.

In this case, the end product sought for the scrap metal originally procured is densified scrap metal suitable for remelting. Sorting, grading and cutting does not constitute a separate stage of processing, at least in the context of this case, because sorted, graded and cut scrap metal is not the "given result" or the "different state or thing" sought to be produced.[1] Furthermore, the fact that sorting, grading and cutting may

---

1. We question whether the sorting, grading and cutting of the 10–20% of scrap metal sold prior to "densifying" is a separate stage of processing given the fact that the end product for that portion and *all* other scrap metal is the same—densified scrap metal suitable for remelting. However, we need not finally address that question. Even if the sorting, grading and cutting of that 10–20% of scrap metal does constitute a separate stage of processing and a full 20% was processed in that fashion, the effect is inconsequential. Had the acquisition cost of that 20% of separately processed scrap metal been deducted from the "total cost of production," the cost of electricity used was still far less than the 10% of the "total cost of production" necessary to invoke the tax exemption.

have enhanced the value and marketability of the scrap metal does not conclusively establish that sorting, grading and cutting constitutes a separate process. Each step in a process conceivably enhances the value and marketability of a product, but this does not necessarily make each step a separate process.

We conclude that the sorting, grading, cutting, and densifying of the scrap metal are specific parts of a *single process* of producing densified scrap metal. They are the "series of acts" that transform the material to the "different state or thing" sought to be produced. The cost of scrap metal subject to that single process must therefore be included in the "total cost of production."

### B.

■ McKinley next argues that even if it conducts only one stage of processing, it is *secondary* processing under the statute. The scrap metal industry, McKinley explains, is a "secondary processing" industry as it deals with recycled materials instead of virgin materials, and its activities are secondary to the mining, processing and manufacturing that produced the scrap metal. On the assumption that the cost of materials was originally borne by the primary stage processors that produced the scrap metal, McKinley concludes that it should not have to include the cost of materials in its secondary processing operations.

The simple answer to this argument is that the statute requires the cost of materials to be factored in at least once for each taxpayer. It is only if a taxpayer has two discrete stages of production that it includes the cost of materials in the first stage and is not required to include the cost again in the second stage. *Goldberg,* 578 S.W.2d at 923. Therefore, if a taxpayer is engaged in only one stage of processing, whether primary or secondary, then the cost of materials must be included in that one stage.

### C.

■ For its third argument, McKinley states that the phrase "total cost of production" as used in the scrap metal industry, does not include the cost of materials. However, McKinley's own accountant testified that the phrase does not have a single well-defined meaning in the practice of accountancy. Indeed, the testimony identified three ways to calculate cost of production: overhead; labor and overhead; and materials, labor and overhead. Even so, McKinley asserts that within the scrap metal industry, it is standard practice not to include the cost of materials.

The meaning of the statutory phrase "total cost of production" depends on the intent of the legislature rather than the practice of the taxpayer. The legislature could have used limiting words to describe "cost of production" but instead chose to use the word "total." Because the word "total" is all-inclusive, the legislature obviously intended the most inclusive definition of cost of production. We conclude, therefore, that the phrase "total cost of production" includes the cost of material.

### III.

■ In its second point of error, McKinley states that "... the Commission's interpretation and application of § 144.030.2(12) violates the Equal Rights and Opportunities, Due Process and Uniformity Clauses of Article I, Sections 2 and 10, and Article X, Section 3, of the Missouri Constitution and the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution in that the denial of the exemption arbitrarily, unreasonably and without a rational basis discriminates between McKinley and other similarly situated taxpayers." McKinley then explains that under the Director's reading of the statute, taxpayers who process materials owned by others or perform multiple stages of processing are treated differently than taxpayers who perform only one stage of processing on materials they have purchased. More simply stated, each of these taxpayers perform identical processing operations but only the latter group is required to include the cost of the materials processed in the "total cost of production."

The state, however, is not prohibited from treating one *class* of taxpayer differently from others. "It is only necessary that there

be a reasonable basis for the ... differentiation and that all persons similarly situated ... be treated alike." *Bopp v. Spainhower,* 519 S.W.2d 281, 289 (Mo. banc 1975). "The test is whether the difference in treatment is an invidious discrimination." *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973); *Bopp,* 519 S.W.2d at 289. Clearly, there can be no invidious discrimination where two parties are not similarly situated, or the law is applied to them in the same manner.

McKinley is not similarly situated with an operator that processes materials owned by others. The distinction between the two is that the former purchases materials, processes them, and sells them for profit, but the latter merely renders a service by processing materials owned by others. A classification based on the sale of processed materials that does not include the sale of services is neither an invidious discrimination nor a constitutional deprivation. *See Sneary v. Director of Revenue,* 865 S.W.2d 342 (Mo. banc 1993).

As we understand McKinley's complaint in relation to two-stage operators, McKinley must include the cost of materials in the "total cost of production" for the secondary stage, while two-stage operators are not required to include the cost of materials for either stage. This argument is without merit because the two-stage operator is required to include the cost of materials in the "total cost of production" for its primary stage. As stated earlier, the statute requires the cost of materials to be factored in at least once for each taxpayer. Therefore, as interpreted, enforced and applied, § 144.030.2(12) does not discriminate between single-stage and dual-stage taxpayers.

## IV.

We hold that the decision of the AHC is authorized by law and supported by competent and substantial evidence upon the whole record. The decision is affirmed.

All concur.