**MID–AMERICA DAIRYMEN, INC., Appellant,**

v.

**DIRECTOR OF REVENUE, Respondent.**

No. 78372.

Supreme Court of Missouri, En Banc.

May 28, 1996.

Steven W. Koslovsky, Richard A. Yawitz, Clayton, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, Andrew J. Lay, Assistant Attorney General, St. Louis, for Respondent.

LIMBAUGH, Judge.

Mid–America Dairymen, Inc. (Mid–America) appeals the decision of the Administrative Hearing Commission (AHC) upholding the Director of Revenue's denial of Mid–America's application for a direct pay authorization under § 144.030.2(12), RSMo 1994. Mid–America had requested the direct pay authorization and a corresponding sales tax exemption for the sales taxes imposed on its purchases of electricity used in the processing of raw milk into various dairy and related food products. We are asked to determine whether the AHC erred in holding that Mid–America's water filtering, spray-drying, and chilling procedures were not discrete primary or secondary processes as contemplated by the statute for purposes of qualifying for the exemption. Because the resolution of that question requires the construction of § 144.030.2(12), a revenue statute, we have jurisdiction. Mo. Const. art. V, § 3. The decision of the AHC is reversed and the case is remanded for a new hearing.

Mid–America sought direct pay authorizations under § 144.030.2(12), which provides an exemption for sales tax on the following:

Electrical energy used in the actual primary manufacture, processing, compounding, mining or producing of a product, or electrical energy used in the actual secondary processing or fabricating of the product, if the total cost of electrical energy so used exceeds ten percent of the total cost of production, either primary or secondary, exclusive of the cost of electrical energy so used.

■ The burden of proof of entitlement to the exemption rests upon Mid–America. *Wetterau, Inc. v. Director of Revenue,* 843 S.W.2d 365, 367 (Mo.1992). The AHC found that each of Mid–America's production lines constituted one unitary process, with no separation between primary and secondary processing. That being the case, the AHC then found that Mid–America should have included material and other production costs in calculating its total cost of production for purposes of seeking the exemption. Once those costs were included in the total cost of production, the cost of electricity fell below the 10% threshold. On the other hand, Mid–America contends that the procedures for which it sought the exemption—water filtering, spray-drying, and chilling—constituted discrete, independent processing for which the cost of materials and other costs need not be included. These costs, as Mid–America explains, are not attributable to the discrete processes at issue.

■ There is no argument that for the purposes of proving entitlement to the exemption, material and other costs incurred in "primary processing" need not be included in the total costs of production associated with "secondary processing." *McKinley. Iron, Inc. v. Director of Revenue,* 888 S.W.2d 705, 708 (Mo. banc 1994); *State ex rel. Union Elec. v. Goldberg,* 578 S.W.2d 921, 923 (Mo. banc 1979). If Mid–America correctly characterized its production stages as discrete primary and secondary processing, it would not have had to include the cost of materials that were part of the primary processing in the total production costs associated with the secondary processing.

Formulating a definition for processing has proved to be problematic. In *Goldberg,* we stated that processing is "a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing." *Goldberg,* 578 S.W.2d at 924. This definition, however, provides little guidance for delineating between *primary* pro-

cessing and *secondary* processing.[1] That question was addressed by this Court in *McKinley Iron, Inc. v. Director of Revenue,* 888 S.W.2d 705 (Mo. banc 1994), a case involving a taxpayer that produced densified scrap metal for sale to foundries. The taxpayer first sorted and graded the scrap metal, cutting some pieces to more manageable sizes. *Id.* at 706. At this point, approximately 10–20% of the scrap was suitably densified and was sold as such, and the other 80–90% was then "densified" by five electric-powered machines. *Id.* The taxpayer in *McKinley Iron* maintained that the sorting, grading, and cutting was a "primary" process because the procedure allegedly enhanced the value of the scrap metal and produced a product for which there was a market, as evidenced by the 10–20% of the scrap that was sold at that point. Densification, it was claimed, was a "secondary" process. *Id.*

To distinguish primary from secondary processing, the Court, while first citing the *Goldberg* definition of "processing," observed that:

Although most processing consists of a "series of acts," any one of which may, technically speaking, transform the material to a "different state or thing," it is not each transformation of the material that, in and of itself, constitutes processing. Instead the parameters of processing are determined by the 'given result' or the 'different state or thing' sought to be produced. Indeed, processing is not complete until the end product is produced.

*Id.* at 707.

In so stating, *McKinley Iron* establishes that a mere transformation is insufficient to constitute processing and that something additional must be found, namely, an end product. Despite this holding from *McKinley Iron,* this Court has yet to fully define "processing" because the necessary characteristics of processing output—the end product—have been left unspecified.

The Court has, however, provided a more explicit description of what the output must

---

1. The *Goldberg* Court did not have to address this issue because the primary procedure therein clearly constituted mining, not processing.

be in defining a related term, manufacturing. In the recent case of *Galamet, Inc. v. Director of Revenue*, 915 S.W.2d 331 (Mo. banc 1996), this Court defined "manufacturing" in the context of § 144.030.2(5), the sales tax exemption for purchases of machinery and equipment used directly in manufacturing. This exemption is part of the same statute and goes hand-in-hand with the sales tax exemption for purchases of electricity used in manufacturing and processing at issue here. We stated in *Galamet* that "[m]anufacturing consists of the alteration or physical change of an object or material in such a way that produces *an article with a use, identity, and value different from the use, identity, and value of the original.*" (emphasis added). *Id.* at 333.

 This complete definition of manufacturing applies equally well to the term "processing." As this Court observed in *State ex rel. Union Elec. Co. v. Goldberg*, the meaning of the term "processing" is ordinarily "included within the meaning of the more general and inclusive term 'manufacturing.'" *Goldberg*, 578 S.W.2d at 924. Indeed, we stated that the term "manufacturing" could encompass most of the terms used by the legislature in § 144.030.2(12). *Id.* at n. 3. It is appropriate, therefore, in fully defining "processing," to draw on the terms we have used in *Galamet* to define "manufacturing." Furthermore, in adopting these terms from *Galamet*, we arrive at a definition that is consistent with the earlier definitions from *Goldberg* and *McKinley Iron.* It is a definition that fills in where we left off in *McKinley Iron* by characterizing the "end product" sought to be produced as an article with a use, identity, and value different from the use, identity, and value of the original.

 Although not stated expressly in *Galamet*, the "different value" component to this definition refers necessarily to market value. As noted in the statute, manufacturing or processing must result in a "product." Implicit in the use of the term "product" is an output with a market value because the economic purpose of manufacturing or processing a product is to market the product. That is not to say, however, that the taxpayer must actually market the product in order to qualify for the exemption. It is sufficient if the product, although marketable, is used instead by the same manufacturer or processor as an ingredient or base for yet another product. In this regard, we emphasize that it is incumbent on the taxpayer to prove the existence of a market, whether or not the product is actually marketed by the taxpayer.

 Having determined the requirements for processing, and in particular when a given stage of processing comes to an end, the question becomes how to distinguish between primary and secondary processing. Obviously, if a taxpayer produces only one marketable product, there can only be primary processing. Secondary processing can only exist where there is yet another marketable product which results from the further processing of an already marketable product produced by the taxpayer. This is clear from the language of § 144.030.2(12) which refers to primary processing of "a product" and secondary processing of "the product"—"the product" referring necessarily to the product resulting from primary processing. The statute's use of the word "product" (not to mention the requirement that processing result in a product) also makes clear that an analysis of a taxpayer's operations for purposes of qualifying for the exemption must be done product-by-product, not process-by-process as Mid–America would do. Because the statute contemplates an exemption for processing of a particular product, and indeed, because processing itself is defined ultimately by its resulting product, one must start by identifying the particular product at issue. In other words, only after a product has been identified can the processing of that product be classified as primary or secondary for the purpose of allocating production costs in order to qualify for the statutory exemption.

In an operation with only two products, one resulting from further processing of the other, it is easy to distinguish between primary and secondary processing, as illustrated by our findings in *McKinley Iron.* In that case, taxpayers produced densified scrap metal suitable for remelting. At the end of the alleged primary processing of sorting,

grading, and cutting, the taxpayer sold 10–20% of the output because it was already sufficiently densified. The rest was then subjected to the densification operations. Despite the marketability of the 10–20%, this Court rejected the taxpayer's argument that it engaged in both primary and secondary processing. The taxpayer made no showing that the 80–90% of the output it did not sell after sorting, grading, and cutting was a marketable product in its then undensified state. Thus, the densification worked upon that 80–90% of the output could not have been secondary processing because no primary processing had yet been completed.

■ Many taxpayers, like Mid–America, have more complex multiple-stage, multiple-product operations, which require a more complex analysis. To obtain the exemption for the electricity used in the processing of a particular product, the taxpayer must first identify "the product" in question, its location in the multistage production chain, and then trace back to the immediately preceding marketable product, the appearance of which marks the delineation between primary and secondary processing of "the product."

As a practical matter, in a multiple-product setting such as Mid–America's, those discrete processing stages that occur in the middle of a production chain may be part of primary processing of the products occurring later in the chain, and yet constitute secondary processing of the product immediately resulting from that stage. For example, if taxpayer's production chain consists of Process A, followed by Process B, and then Process C, and each process produces its own marketable product which then becomes, either all or in part, the input of the succeeding process, Process B would constitute secondary processing of Product B, and, along with Process A, be part of the primary processing of Product C.

■ In sum, to qualify for a direct pay authorization under § 144.030.2(12), the taxpayer must first prove that it engages in processing (or manufacturing, or any of the other statutorily recognized activities), which is the transformation of a substance into a "product"—an item with a new identity, use, and market value produced by the taxpayer's efforts. The product provides the base for analyzing the primary or secondary nature of the processing for which the taxpayer seeks exemption. This analysis is performed as set forth above. Assuming the production stages can be properly split into primary and secondary, the taxpayer may then allocate its total production costs accordingly to prove that its electrical costs exceed the 10% statutory threshold for either the primary or secondary stage.

This case must turn, ultimately, on the question of whether Mid–America met its burden of proof to qualify for the exemption. In this determination, however, neither Mid–America, nor the Director, nor the AHC had the benefit of the expanded definition of primary and secondary processing set out in this opinion. The record, derived as it is from the parties' incomplete understanding of the proof required to qualify for the exemption under § 144.030.2(12), is an insufficient basis for a determination by this Court as to whether Mid–America is entitled to the exemption or whether the AHC correctly determined the legal issues before it. Under these circumstances, the judgment of the AHC must be reversed and the case remanded for a new hearing.

It is so ordered.

All concur.